**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

        v.

C. LYNN MOSES,
        *Defendant-Appellant.*

No. 06-30379

D.C. No.
CR-05-00061-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
July 10, 2007—Seattle, Washington

Filed August 3, 2007

Before: Ferdinand F. Fernandez and Kim McLane Wardlaw,
Circuit Judges, and Louis H. Pollak,* District Judge.

Opinion by Judge Fernandez

*The Honorable Louis H. Pollak, Senior United States District Judge
for the District of Pennsylvania, sitting by designation.

**COUNSEL**

Blake S. Atkin, Atkin Law Offices, P.C., Salt Lake City, Utah, for the defendant-appellant.

Matthew J. McKeown, Acting Assistant Attorney General, and Katherine W. Hazard, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

**OPINION**

FERNANDEZ, Circuit Judge:

Despite numerous warnings over the years, Charles Lynn Moses continued to do work in the channel of Teton Creek in Idaho for the purpose of rerouting, reshaping and otherwise controlling the flow of the waters of the Creek. The government finally prosecuted him for violating the Clean Water Act (CWA). *See* 33 U.S.C. §§ 1251-1387. He was convicted and sentenced, and now appeals. He claims that there was no dis-

charge of pollutants into the waters of the United States. We disagree and affirm.

## BACKGROUND

Moses is a real estate broker and developer in Driggs, Idaho. Beginning in the late 1970s, he worked on a development known as the Aspens Subdivision, an approximately 50 acre parcel of land in Teton County, Idaho, which is located on a flood plain next to Teton Creek. Because of an irrigation diversion structure installed in Alta, Wyoming, upstream of the subdivision, water actually flows in the portion of Teton Creek adjacent to the subdivision only during the spring run-off, which lasts about two months per year. During that time, water is released from the diversion. When it does flow, the volume and power of the flow are high, even torrential. Teton Creek is a tributary of the Teton River, which flows into the Snake River. Water continues to flow year-round in Teton Creek above the diversion, and also from a point below the subdivision until it reaches the Teton River. There is no claim that the Snake River, the Teton River, and Teton Creek, apart from the segment that flows only during the spring runoff, fail to qualify as waters of the United States.

Beginning in the 1980s, and continuing for more than 20 years, Moses has worked to reroute and reshape Teton Creek, in an attempt to convert the original three channels of the Creek into one broader and deeper channel, which would carry all of the seasonal flow of water. Over that period, including during more recent work in 2002, 2003 and 2004, Moses hired heavy equipment operators to recontour and redeposit material within the Creek using bulldozers, and to erect log and gravel structures in the Creek using other heavy equipment.

Beginning in 1982 and on several occasions thereafter, the Army Corps of Engineers (the Corps) warned Moses that his stream alteration work required a CWA permit. During a

hearing on the Aspens Subdivision in 1982, the Corps informed Moses that it did have jurisdiction over the stream, even though the flow of the stream was intermittent. In 1995, the Corps issued a cease and desist order that directed Moses to immediately stop all dredge and fill operations in Teton Creek. In 1996 and 1997, the Corps once again wrote to Moses, seeking his cooperation and explaining its regulations. Moses essentially ignored all of that.

On two separate occasions in 2002,[1] Moses hired the owner of Tupco, Inc., an excavation business to rebuild and repair log structures, to perform dredging and filling work, to build a temporary ramp, and to remove gravel bars in Teton Creek. An environmental resources specialist with the Corps saw the work going on within the Creek bed in September 2002, informed Moses that he needed a permit to conduct the work, and advised him that the activities could result in civil or criminal penalties. Moses treated that warning with his usual disdain. In December 2002, the Corps issued a notice of violation to Moses, which again informed him of the need for a permit and of the potential for criminal penalties.

Undeterred, in Spring 2003,[2] Moses contacted the excavation business operator for a third time and asked him to work in Teton Creek. The operator again "repaired" log structures within the Creek bed, and moved gravel out of and within the Creek bed. Several months later, the Environmental Protection Agency (EPA) issued an administrative compliance order pursuant to 33 U.S.C. § 1319(a), which directed Moses to immediately "cease any unauthorized discharges of dredged material, fill material, and other pollutants to any stream bed and banks on the [s]ite," and to submit a work plan for restoring Teton Creek. Moses did not respond to the EPA's order, and less than two months later he hired the owner of Nord

---

[1]The work was performed once before the 2002 runoff and once after the runoff.

[2]This work was hired before the 2003 high runoff.

Excavating and Paving, Inc., to do more bulldozing work in Teton Creek. That consisted of the removal of gravel bars and contouring of the Creek bed.

Overall, the work on the Creek bed was substantial. Thousands of cubic yards of gravel and other materials were moved, and the channel was deepened, widened, and greatly disturbed. The disturbance reached both upstream and downstream of the work perpetrated by Moses and his minions. Of the hundreds of projects surveyed by Dale Miller, a government expert, Teton Creek was "probably one of the more impacted streams" he had observed, "both in terms of change [at the part in question here] and also the upstream and downstream effects that have resulted from that change." The Creek was unstable into the bargain.

Finally, in March 2005, a federal grand jury returned a three-count indictment charging Moses with felonious violations of the CWA for knowingly discharging, and causing to be discharged, pollutants (including dredged and fill material) from a point source or point sources into waters of the United States without a permit. *See* 33 U.S.C. §§ 1311(a), 1319(c)(2)(A); 18 U.S.C. § 2. The counts covered discharges by Moses into Teton Creek in the Aspens Subdivision area from 2002 to 2004.

A four-day jury trial was held in September of 2005. On September 14, 2005, after the close of the government's case, Moses timely moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the court denied. Ultimately, the jury returned a verdict finding Moses guilty on all counts. In February of 2006, Moses moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and attempted to introduce new evidence to support an estoppel argument. Moses claimed he had been misled by the government into believing that his conduct was lawful. The district court denied the motion. One

month later, Moses filed a second motion for a new trial. The district court denied that motion also.

On June 30, 2006, the district court sentenced Moses to 18 months imprisonment on each count, to be served concurrently, and imposed a $9,000 fine, a $300 special assessment, and one year of supervised release. This appeal followed. Moses asserts that the evidence was not sufficient to support the verdict, and that he should have been granted a new trial.

## JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

Because Moses "preserved his sufficiency claim by moving for a judgment of acquittal, we review his claim de novo." *United States v. Lyons*, 454 F.3d 968, 971 (9th Cir. 2006). Evidence is sufficient to support a conviction, if " 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)).

We review for abuse of discretion a district court's denial of a motion for a new trial. *See United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004); *United States v. Sarno*, 73 F.3d 1470, 1507 (9th Cir. 1995). A new trial may be granted by the district court when the "interest of justice so requires." Fed. R. Crim. P. 33(a); *Mack*, 362 F.3d at 600.

## DISCUSSION

Moses primarily attacks his conviction on the ground that the evidence does not support a determination that the portion of Teton Creek that he manipulated constitutes a water of the

United States,[3] and even if it does, the evidence will not support a determination that he made a discharge[4] into that United States water. We will take those issues up first. We will then address his secondary issues, which rely on a notion that he did not need a permit anyway. As already indicated, and as we will explain further, we do not agree with any of his theories.

## A. *Sufficiency of the Evidence*

[1] Moses' sufficiency arguments turn on his claims about the reach of the CWA. That law was enacted by Congress in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to achieve its objectives, Congress outlawed the unauthorized "discharge of any pollutant by any person." *Id.* § 1311(a). That, in turn, means that Moses could not add "any pollutant to navigable waters,"[5] which means "the waters of the United States."[6] As used in the CWA, pollutant means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sledge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6). Those facially simple provisions have generated a good deal of regulatory and judicial attention. Suffice it to say that while they are designed to bring clarity to the Nation's waters, they, themselves, are not hyaline. Moses was not much interested in the subtleties involved; he should have been before he undertook to ignore the government's steady trickle of warnings.

---

[3]33 U.S.C. § 1362(7).

[4]33 U.S.C. § 1362(16).

[5]33 U.S.C. § 1362(12); *see also id.* § 1362 (16).

[6]33 U.S.C. § 1362(7).

(1)   *Waters of the United States*

**[2]** The first thing that is apparent is that under both Corps and EPA regulations,[7] a body of water need not, itself, be navigable in order to be one of the waters of the United States. Even wetlands can come within that concept. *See, e.g.*, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131-35, 106 S. Ct. 455, 461-63, 88 L. Ed. 2d 419 (1985). The Corps has issued regulations which define waters of the United States to mean:

> (1)   All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

> (2)   All interstate waters including interstate wetlands;

> (3)   All other waters such as intrastate lakes, rivers, streams (including intermittent streams) . . .

> . . . .

> (5)   Tributaries of waters identified in paragraphs (a)(1)-(4) of this section . . . .

33 C.F.R. § 328.3(a). EPA regulations are to the same effect. *See* 40 C.F.R. § 122.2 (definition of waters of the United States).

**[3]** We do not see how one can gainsay the fact that Teton Creek was at least a tributary in the sense used by the Corps' definition before the Creek was interrupted at Alta, Wyoming. As we have noted, it flowed interstate and emptied into the

---

[7]We owe deference to the agencies' interpretations. *See San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 705 (9th Cir. 2007).

Teton River, which itself emptied into the Snake River.[8] That being so, it is doubtful that a mere man-made diversion would have turned what was part of the waters of the United States into something else and, thus, eliminated it from national concern. Rather, what the courts have said regarding navigable waters would seem applicable here. In *George v. Beavark, Inc.*, 402 F.2d 977, 978 (8th Cir. 1968), the court was faced with a claim that a boat floating on a man-made lake, which was created by damming the upper reaches of the White River, was upon navigable waters of the United States. The court, with no hesitation, declared: "If the river was navigable prior to construction of the dam, it continues to be considered as a navigable stream." *Id.* And in a case where it pointed out that navigability is not to be appraised on the basis of natural conditions only,[9] the Supreme Court went on to state that "[w]hen once found to be navigable, a waterway remains so."[10]

**[4]** Similarly, we do not see how a mere man-made diversion, however long ago undertaken, could change Teton Creek from a water of the United States into something else. If the diversion could not do that, even the now often-dry portion of Teton Creek remains a water of the United States just as it was antediluvially. Of course, we recognize that the diversion did take place long before the enactment of the CWA itself. That should not change the analysis. But, as we will explain, regardless of that purely historical consideration, present conditions also dictate that the often-dry portion of Teton Creek is a water of the United States.

---

[8]There can be little doubt that a tributary of waters of the United States is itself a water of the United States. *See United States v. Hubenka*, 438 F.3d 1026, 1032 (10th Cir. 2006); *United States v. Phillips*, 367 F.3d 846, 855-56 (9th Cir. 2004).

[9]*See United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407, 61 S. Ct. 291, 299, 85 L. Ed. 243 (1940); *see also Boone v. United States*, 944 F.2d 1489, 1492-93 & 1493 n.6 (9th Cir. 1991).

[10]*Appalachian Elec.*, 311 U.S. at 408, 61 S. Ct. at 299.

**[5]** Put most starkly, the question is whether a seasonally intermittent stream which ultimately empties into a river that is a water of the United States can, itself, be a water of the United States. In *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001), we answered that question in the affirmative, when we held:

> But even if [the alleged polluter] succeeds, at certain times, in preventing the canals from exchanging any water with the local streams and lakes, that does not prevent the canals from being "waters of the United States" for which a permit is necessary. Even tributaries that flow intermittently are "waters of the United States."

*Id.* at 534. In so doing, we relied upon the following reflection by the Eleventh Circuit Court of Appeals:

> [T]here is no reason to suspect that Congress intended to exclude from "waters of the United States" tributaries that flow only intermittently. Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage . . . . Rather, as long as the tributary would flow into the navigable body of water "during significant rainfall," it is capable of spreading environmental damage and is thus a "water of the United States" under the Act.

*United States v. Eidson*, 108 F.3d 1336, 1342 (11th Cir. 1997) (citations and footnote reference omitted).

Since then, the Supreme Court has revisited this area, but has not undercut our prior analysis. *See Rapanos v. United States*, ___ U.S. ___, 126 S. Ct. 2208, 165 L. Ed. 2d 159 (2006). In that case, the Court actually directly dealt with the reach of the CWA over wetlands,[11] but in so doing addressed

---

[11]The scope of the wetlands regulation had been visited by the Court on two previous occasions. *See Solid Waste Agency v. U.S. Army Corps of*

itself to the question of what could be a tributary. *Id.* at ___, 126 S. Ct. at 2225. A four justice plurality ultimately declared:

> In sum, on its only plausible interpretation, the phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps' expansive interpretation of the "the waters of the United States" is thus not "based on a permissible construction of the statute."

*Id.* at ___, 126 S. Ct. at 2225 (citations omitted). But that absolute sounding statement must be taken in the context of the plurality's prefatory definitional statement that "[b]y describing 'waters' as 'relatively permanent,' we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. We also do not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months . . . ." *Id.* at ___ n.5, 126 S. Ct. at 2221 n.5. The four dissenting justices did agree that, "common sense and common usage demonstrate that intermittent streams, like perennial streams, are still streams." *Id.* at ___, 126 S. Ct. at 2260 (Stevens, J., dissenting).

That left Justice Kennedy in the middle so to speak, or to put it more legally accurately, that left his opinion as the controlling rule of law. *See N. Cal. River Watch v. City of Heald-*

---

*Eng'rs*, 531 U.S. 159, 171-72, 121 S. Ct. 675, 682-83, 148 L. Ed. 2d 576 (2001); *Riverside Bayview Homes*, 474 U.S. at 139, 106 S. Ct. at 465.

*sburg*, 457 F.3d 1023, 1029 (9th Cir. 2006).**¹²** His opinion surely does not denigrate or even undercut the concept that a seasonal stream could be a water of the United States. In fact, he put it thusly: "[T]he dissent is correct to observe that an intermittent flow can constitute a stream, in the sense of a current or course of water or other fluid, flowing on the earth, while it is flowing. It follows that the Corps can reasonably interpret the Act to cover the paths of such impermanent streams." *Rapanos*, ___ U.S. at ___, 126 S. Ct. at 2243 (Kennedy, J., concurring) (internal quotation marks and citations omitted). In fact, he considered the plurality's general principle to be inadequate. As he said, in language quite apposite to the case at hand:

> The plurality's first requirement — permanent standing water or continuous flow, at least for a period of "some months," — makes little practical sense in a statute concerned with downstream water quality. The merest trickle, if continuous, would count as a "water" subject to federal regulation, while torrents thundering at irregular intervals through otherwise dry channels would not. Though the plurality seems to presume that such irregular flows are too insignificant to be of concern in a statute focused on "waters," that may not always be true. Areas in the western parts of the Nation provide some examples.

*Id.* at ___, 126 S. Ct. at 2242 (citation omitted). Justice Kennedy went on to hold that what is required is a showing of a "significant nexus" between wetlands and navigable waters, and declared that absent more specific regulations, the nexus

---

**¹²**Both in his brief and at argument, Moses has attempted to induce us to review and eschew *River Watch*. As Moses should know, we cannot do that. *See*, *e.g.*, *Cal. Dept. of Water Res. v. FERC*, 361 F.3d 517, 521 (9th Cir. 2004); *Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 860 (9th Cir. 1996).

must be established by the Corps "on a case-by-case basis when it seeks to regulate wetlands based on adjacency to non-navigable tributaries." *Id.* at ___, 126 S. Ct. at 2249.

**[6]** Therefore, far from undercutting our decision in *Headwaters*, the Supreme Court unanimously agreed that intermittent streams (at least those that are seasonal) can be waters of the United States. That being so, we cannot say that the evidence here failed to sustain the verdict.

**[7]** The man-made severance of Teton Creek at Alta, Wyoming, may have made the portion in question here dry during much of the year, but when the time of runoff comes, the Creek rises again and becomes a rampaging torrent that ultimately joins its severed lower limb and then rushes to the Teton River, the Snake River, and onward to the Columbia River and the Pacific Ocean. Indeed, it is that very rush of water that induced Moses to take action.

**[8]** In short, on this record Teton Creek constitutes a water of the United States and, as the Supreme Court has recognized, regardless of any other disagreements, "no one contends that federal jurisdiction appears and evaporates along with the water in such regularly dry channels." *Id.* at ___ n.6, 126 S. Ct. at 2221 n.6. That glissades to consideration of Moses' next claim.

(2) *Discharge*

Moses' attack on the evidence to support the element of discharge of a pollutant fares no better. He argues that he did not run his heavy equipment and engage in his assault on Teton Creek while the water was actually rushing between its banks. Thus, he says, there was no discharge into waters of the United States. He is wrong.

**[9]** Common sense tells us that, especially if the Corps

retains jurisdiction, as it does,[13] the mere fact that pollutants are deposited while this part of Teton Creek is dry cannot make a significant difference. *See Headwaters*, 243 F.3d at 533-34; *Eidson*, 108 F.3d at 1342. To hold otherwise would countenance significant pollution of the waters of the United States as long as the polluter dumped the materials at a place where no water was actually touching them at the time.

**[10]** In addition, the evidence clearly supports a determination that the result of Moses' efforts was to create a situation where pollutants — disturbed and moved materials as well as log structures — remained in Teton Creek when the water rose within it. In fact, those pollutants were intended to do just that. Even if no new materials were added to the Creek bed by Moses' activities, simply dredging up and redepositing what was already there is sufficient to run afoul of the CWA. *See Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 814 (9th Cir. 2001), *aff'd*, 537 U.S. 99, 123 S. Ct. 599, 154 L. Ed. 2d 508 (2002) (affirmance by an equally divided Court); *Rybacheck v. U.S. Envtl. Prot. Agency*, 904 F.2d 1276, 1285 (9th Cir. 1990). Moreover, the evidence supported a determination that when the water flowed, materials dislodged by Moses' operations would be carried downstream into the lower portion of Teton Creek and on into the Teton River.

But, argues Moses, even if he did see to the moving of thousands upon thousands of cubic yards of material, by taking it from one part of Teton Creek and depositing it in another location within the Creek, that was no violation; it was just an incidental fallback of the material. *See* 33 C.F.R. § 323.2(d)(2)(i). Was it incidental fallback? To lay the definition alongside the evidence in this case is to answer the question. The regulations provide:

---

[13]*See Rapanos*, ___ U.S. at ___, n.6, 126 S. Ct. at 2221, n.6.

Incidental fallback is the redeposit of small volumes of dredged material that is incidental to excavation activity in waters of the United States when such material falls back to substantially the same place as the initial removal. Examples of incidental fallback include soil that is disturbed when dirt is shoveled and the back-spill that comes off a bucket when such small volume of soil or dirt falls into substantially the same place from which it was initially removed.

33 C.F.R. § 323.2(d)(2)(ii); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1403-04 (D.C. Cir. 1998) (holding Corps can regulate redeposit, but must allow for mere incidental fallback). The evidence here shows massive movement and redistribution of materials within Teton Creek. Only a mind committed to a predetermined answer could see that material redeposit as similar to a small volume of dirt that happened to fall off a bucket and back to the approximate place of removal.[14]

The claim that there was insufficient evidence of discharge of pollutants must fail.

B. *Claims That No Permit Was Required*

After the jury verdict went against him, Moses tried to recoup by claiming that he did not need a permit in the first place, and was entitled to entirely ignore the demands of the EPA and the Corps. He should have listened.

[11] Moses first points to the exception for discharges for

---

[14]We have not overlooked Moses' passing comment that there should have been an instruction on incidental fallback. However, because that was not raised at the district court, our review is for plain error, and on this record he has not shown any interference with any substantial rights. *See United States v. Tirouda*, 394 F.3d 683, 688 (9th Cir. 2005).

the purpose of maintenance of currently serviceable structures. 33 U.S.C. § 1344(f)(1)(B). But that exception has an exception of its own because the work performed cannot further impair the waters of the United States if the exception is to apply at all. *See id.* § 1344(f)(2); *see also* 33 C.F.R. § 323.4(a)(2). Exceptions from the CWA must be "analyzed in light of the Act's purposes" and exceptions must be construed narrowly. *United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986). As the district court pointed out, Moses' activities went far beyond anything that could be called mere maintenance of serviceable structures. He made great changes to Teton Creek itself, which can hardly be called a structure anyway. And even if some of the log placements within the Creek were, themselves, structures that could be repaired, some of those structures were actually built during 2001, and none of them were built pursuant to a permit. All in all, while Moses' theory might be interesting, the evidence is against him. The district court did not abuse its discretion when it denied a new trial on this basis.

**[12]** Nor does Nationwide Permit No. 3, 67 Fed. Reg. 2078 (Jan. 15, 2002) (the Permit), supply the apotropaion that Moses seeks. In the first place, the Permit was issued pursuant to the Rivers and Harbors Act. *See* 33 U.S.C. § 403; *see also United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1157-59 (1st Cir. 1987). It does not apply to activities covered by the CWA. That was plain in 1980 when Moses first began his activities in Teton Creek, and it was plain during the period covered by the indictment. *See id.* at 1159-60.

**[13]** Secondly, even if the Permit did have application here, it cannot be said that the vast amount of work on Teton Creek took place before the Corps asserted jurisdiction. At best, the new evidence submitted with Moses' motion for a new trial would indicate there is some conflict regarding his 1980 activity, but there can be no doubt that jurisdiction was asserted at least as early as 1982. It was surely asserted during the period covered by the indictment.

The district court did not abuse its discretion when it determined that a new trial based upon the Permit was not appropriate.

## CONCLUSION

Moses chose to ignore all demands by the EPA and the Corps that he comply with the Clean Water Act before he undertook his activities in Teton Creek. Even if he was convinced that the Corps had eschewed jurisdiction in 1980, it is not clear why he thought that gave him a sempiternal right to continue after jurisdiction was duly asserted. And while his sang-froid (or even contempt) in the face of agency demands may show either courage or foolhardiness, it does not save him from the consequences of his actions.

The evidence supported the determination that Teton Creek does constitute a water of the United States and that Moses did discharge pollutants into it. Moreover, his actions were not exempt and were not taken pursuant to Nationwide Permit No. 3.

AFFIRMED.