**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

JOSEPH DAVID ROBERTSON,
    *Defendant-Appellant.*

No. 16-30178

D.C. No.
6:15-cr-00007-
DWM-1

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, Senior District Judge, Presiding

Argued and Submitted August 29, 2017
Seattle, Washington

Filed November 27, 2017

Before: M. Margaret McKeown and Ronald M. Gould,
Circuit Judges, and Barbara Jacobs Rothstein,* 
District Judge.

Opinion by Judge Gould

---

* The Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed convictions for violating the Clean Water Act (CWA) by knowingly discharging dredged or fill material from a point source into a water of the United States without a permit; willfully injuring and committing depredation of property of the United States, causing more than $1,000 worth of damage to the property; and knowingly discharging dredged or fill material from a point source into a water of the United States on private property without a permit.

The defendant's first trial ended with a hung jury, and the defendant was convicted after a second trial.

The panel rejected the defendant's contention that the Government did not establish that there was jurisdiction under the CWA.  The panel held that *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993 (2007) (holding that Justice Kennedy's concurrence in *Rapanos v. United States*, 547 U.S. 715 (2006), is the controlling test for determining CWA jurisdiction), is not clearly irreconcilable with *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), and remains binding precedent.  The panel held that the district court did not err in determining that CWA jurisdiction existed under the "significant nexus" test set forth in Justice Kennedy's concurrence in *Rapanos*.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel rejected the defendant's contentions that the statutory term "waters of the United States" is unconstitutionally vague and that he did not have fair warning of the meaning of that term.

The panel held that a criminal defendant cannot challenge the sufficiency of the evidence at a previous trial following conviction at a subsequent trial. The panel therefore deemed foreclosed the defendant's argument that the district court should have granted his motion to acquit after the jury deadlocked at his first trial.

The panel held that the district court did not abuse its discretion in allowing the Montana State Program Manager for the Army Corps of Engineers and Supervisory Civil Engineer to testify as an expert witness. The panel held that the district court did not abuse its discretion in excluding an Army Corps of Engineers guidance manual or a crystal mine study.

**COUNSEL**

Michael Donahoe (argued), Deputy Federal Public Defender; Anthony R. Gallagher, Federal Defender; Federal Defenders of Montana, Helena, Montana; for Defendant-Appellant.

John David Gunter II (argued) and Robert Stockman, Attorneys; John C. Cruden, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Bryan R. Whittaker and Eric E. Nelson, Office of the United States Attorney, Helena, Montana; for Plaintiff-Appellee.

Roger I. Roots, Livingston, Montana, for Amici Curiae The Constitution Society and Founder and President Jon Roland.

Anthony L. François, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Chantell and Michael Sackett, John Duarte, and Duarte Nursery Inc.

## OPINION

GOULD, Circuit Judge:

Between October 2013 and October 2014, Joseph David Robertson excavated and constructed a series of ponds on National Forest System Lands and on the privately owned Manhattan Lode mining claim. In the process of creating these ponds, Robertson discharged dredged and fill material into the surrounding wetlands and an adjacent tributary, which flows to Cataract Creek. Cataract Creek is a tributary of the Boulder River, which in turn is a tributary of the Jefferson River—a traditionally navigable water of the United States. Robertson was warned by an EPA Special Agent that his activities "very likely" required permits. Yet, he did not get permits to build the ponds or to discharge dredged or fill material into waters of the United States.

The Forest Service soon learned of Robertson's activities. And on May 22, 2015, a grand jury charged Robertson with three criminal counts. Count I charged Robertson with knowingly discharging dredged or fill material from a point source into a water of the United States without a permit in violation of the Clean Water Act (CWA), 33 U.S.C. § 1251–1388. Count II charged Robertson with willfully injuring and committing depredation of property of the United States, namely National Forest Service Land,

causing more than $1,000 worth of damage to the property, in violation of 18 U.S.C. § 1361. Count III charged Robertson with another CWA violation for knowingly discharging dredged or fill material from a point source into a water of the United States on private property without a permit.

Robertson's initial jury trial was held from October 5 to October 8, 2015. At the close of the Government's case and at the close of the presentation of evidence, Robertson unsuccessfully moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. That first jury trial ended with a hung jury, and the judge declared a mistrial. Robertson again moved for acquittal on all three counts, arguing that the Government's evidence was insufficient to sustain a conviction. The district court denied this motion.

Robertson's second jury trial was held from April 4 to April 7, 2016. Robertson again moved for acquittal on all three counts after the close of the Government's case and at the close of evidence. And the district court again denied both motions. On April 7, 2016, the jury returned guilty verdicts on all three counts. On April 21, 2016, Robertson renewed his motions for acquittal and moved for a new trial. The district court denied those motions, concluding that the verdict was supported by sufficient evidence.

Robertson timely filed this appeal, over which we have jurisdiction pursuant to 28 U.S.C. § 1291.

# I

Robertson argues (1) that the Government did not establish that there was CWA jurisdiction, and (2) that he lacked fair warning of the scope of CWA jurisdiction. He also (3) challenges the sufficiency of evidence at an earlier

trial that ended in a mistrial; (4) appeals some evidence rulings; and (5) contests the calculation of restitution.[1]

We review the district court's interpretation of the jurisdictional bounds of the CWA *de novo*. *See United States v. Lewis*, 67 F.3d 225, 228 (9th Cir. 1995). We also review whether a statute is unconstitutionally vague *de novo*. *See United States v. Cooper*, 173 F.3d 1192, 1202 (9th Cir. 1999). We review the challenged evidence rulings and a challenge to the district court permitting an expert to testify for abuse of discretion. *See United States v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007); *United States v. Layton*, 767 F.2d 549, 553 (9th Cir. 1985).

## II

We look first at the CWA jurisdiction issue. To assess Robertson's arguments on these points, some background on the CWA and the cases that have interpreted it is necessary. Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To meet this goal, the CWA prohibits the discharge of dredge or fill material into "navigable waters" unless authorized by a permit from the Secretary of the Army through the Army Corps of Engineers ("the Corps"). *Id.* §§ 1311(a), 1311(d), 1344(a). Any person who knowingly violates § 1311 by discharging a pollutant without a permit "shall be punished" by a fine, imprisonment, or both. *Id.* § 1319(c)(2).

---

[1] We address and reject Robertson's challenge to the district court's ruling compelling Robertson to bear a part of the costs of his defense in the concurrently filed memorandum disposition.

At issue on jurisdiction is the meaning of "navigable waters," and the reach of the CWA. "Navigable waters" is defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). For there to be CWA jurisdiction here then, the creek and wetlands that Robertson polluted had to be "waters of the United States."

The reach of the Corps' jurisdiction over "navigable waters" is controversial and has been the subject of many Supreme Court cases. *See, e.g.*, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) (upholding a Corps' regulation that extended the Corps' authority under § 1344 to wetlands "adjacent to navigable or interstate waters and their tributaries"); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) (invalidating the Corps' "Migratory Bird Rule" because the Corps does not have CWA jurisdiction over non-navigable, isolated, intrastate waters that are not adjacent to open water).

Central to this appeal is the Supreme Court's fractured 4-1-4 decision, *Rapanos v. United States*, 547 U.S. 715 (2006). In that case, the Court confronted the issue of whether wetlands, which did not contain or directly abut traditionally navigable waterways, were "waters of the United States" subject to the Corps' jurisdiction under the CWA. *See id.* at 729–30 (plurality); *id.* at 759 (Kennedy, J., concurring in the judgment). In answering this question, the Court had to address whether the Corps' regulations were a permissible interpretation of the CWA. The regulations had interpreted "waters of the United States" very broadly, including not just traditionally navigable interstate waters, but also

> "[a]ll interstate waters including interstate wetlands," [33 C.F.R.] § 328.3(a)(2); "[a]ll

other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce," [*id.*] § 328.3(a)(3); "[t]ributaries of [such] waters," [*id.*] § 328.3(a)(5); and "[w]etlands adjacent to [such] waters [and tributaries] (other than waters that are themselves wetlands)," [*id.*] § 328.3(a)(7). The regulation defines "adjacent" wetlands as those "bordering, contiguous [to], or neighboring" waters of the United States. [*Id.*] § 328.3(c). It specifically provides that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" [*Id.*]

*Rapanos*, 547 U.S. at 724 (plurality).

The plurality opinion, authored by Justice Scalia, and joined by Chief Justice Roberts, and Justices Thomas and Alito, concluded that the Corps' regulations were not "based on a permissible construction of the statute." *Id.* at 739 (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984)). The plurality held that "the phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" *Id.* (quoting Webster's Second 2882) (alterations in original). The term, according to Justice

Scalia's opinion, "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* The plurality went on to conclude that wetlands are covered by the CWA only if two conditions are met: first, "the adjacent channel contains a 'wate[r] of the United States,' (*i.e.,* a relatively permanent body of water connected to traditional interstate navigable waters);" and second, "the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 742 (alteration in original). The plurality ultimately remanded the case to the lower court so that it could determine, in the first instance, whether the wetlands at issue were subject to the CWA under the new standard.

Justice Kennedy, providing the fifth vote supporting the judgment concurred in the judgment but rejected the plurality's test and outlined his own test to determine whether a wetland that is not adjacent to and does not contain a navigable-in-fact water is subject to the CWA. *See id.* at 758–59, 768–78 (Kennedy, J., concurring in the judgment). Justice Kennedy concluded that the Corps could reasonably interpret the CWA to cover "impermanent streams," *id.* at 770, and he concluded that the "Corps' definition of adjacency is a reasonable one," *id.* at 775. Justice Kennedy held that the Corps could exercise CWA jurisdiction over a wetland only if there was "a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Id.* at 779; *see also id.* at 767. He explained, "wetlands possess the requisite nexus, and come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily

understood as 'navigable.'" *Id.* at 780. When "wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.*

Four members of the Court joined in a dissent authored by Justice Stevens. His dissent concluded that *Riverside Bayview* controlled the cases, that the Corps' regulations were a reasonable interpretation of the CWA, and that any wetland that is adjacent to navigable waters or their tributaries is subject to the CWA. *See Rapanos*, 547 U.S. at 787, 792 (Stevens, J., dissenting). He disagreed with both the plurality and with Justice Kennedy. He noted that "Justice Kennedy's approach had far fewer faults," and concluded that both decisions "fail[ed] to give proper deference to the agencies entrusted by Congress to implement the Clean Water Act." *Id.* at 810. The dissenting Justices would have upheld the Corps' jurisdiction in the cases at issue in *Rapanos* "and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied." *Id.* at 810. Indeed, although the dissent "assume[d] that Justice Kennedy's approach will be controlling in most cases because it treats more of the nation's waters as within the Corps' jurisdiction," the dissent would uphold jurisdiction when *either* test was met—even "in the unlikely event that the plurality's test is met but Justice Kennedy's is not." *Id.* at 810 n.14; *see also id.* at 810. The dissent also stated that "in these and future cases the United States may elect to prove jurisdiction under either test." *Id.* at 810 n.14.

All this paints a rather complex picture, and one where without more it might not be fair to expect a layman of normal intelligence to discern what was the proper standard to determine what are waters of the United States. But the

substance of that picture was clarified by later decisional law within the Ninth Circuit.

Specifically, in *Northern California River Watch v. City of Healdsburg*, a precedent that is critical to our decision today, we held that Justice Kennedy's opinion was the controlling opinion from *Rapanos*. 496 F.3d 993, 995 (2007). We explained that because it is "the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases, . . . Justice Kennedy's concurrence provides the controlling rule of law for our case." *Id.* at 999–1000; *see also United States v. Moses*, 496 F.3d 984, 990 (9th Cir. 2007) (recognizing Justice Kennedy's "opinion as the controlling rule of law"); *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir. 2007) ("Justice Kennedy's *controlling concurrence* explained that only wetlands with a significant nexus to a navigable-in-fact waterway are covered by the Act" (emphasis added))*.* In reaching this conclusion, we relied upon *United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006). *See City of Healdsburg*, 496 F.3d at 999–1000. In *Gerke*, the Seventh Circuit had explained that Justice Kennedy's test—which it also found to be controlling—was "narrower (so far as reining in federal authority is concerned) than the plurality's in most cases." 464 F.3d at 724–25. The Eleventh Circuit has also concluded that Justice Kennedy's test is controlling. *See United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) (concluding that under the facts of *Rapanos*, Justice Kennedy's opinion is the narrowest and controlling).

Other circuits have adopted different approaches. The First, Third, and Eighth Circuits have explicitly concluded that the federal Government can establish CWA jurisdiction if it can meet either the plurality's or Justice Kennedy's

standard. *United States v. Johnson*, 467 F.3d 56, 64–66 (1st Cir. 2006); *United States v. Donovan*, 661 F.3d 174, 176, 182 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009). The Fourth Circuit has used Justice Kennedy's test, without deciding whether the plurality's test could provide an alternate ground for establishing CWA jurisdiction. *See Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs*, 633 F.3d 288 (4th Cir. 2011). The Sixth Circuit has expressly not yet decided which test is controlling. *See United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009). It appears that the Fifth Circuit has also not yet decided which test controls, *see United States v. Lucas*, 516 F.3d 316, 324–28 (5th Cir. 2008), although it has indicated—albeit in an unpublished decision—that jurisdiction could be established under either test, *see United States v. Lipar*, 665 F. App'x 322, 325 (5th Cir. 2016).

In view of these competing precedents interpreting *Rapanos*, and further uncertainty engendered by our later en banc decision in *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016), Robertson argues that Justice Kennedy's test from *Rapanos* is not the controlling test for determining CWA jurisdiction, and that the trial Court erred by basing the jury instructions on Justice Kennedy's test.

### III

Robertson's primary argument is that *City of Healdsburg* is not binding in light of *Davis*. He asserts that under the "reasoning-based" framework established by *Davis*, the *Rapanos* plurality opinion is controlling. In reaching this conclusion, Robertson argues that the court cannot consider Justice Stevens's dissent. He argues that if we do not adopt the plurality decision as controlling, we must conclude that "no single rationale commanded a majority of the *Rapanos* court."

In *Marks v. United States*, the Supreme Court explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

Recognizing the difficulty that courts have faced in discerning what the Supreme Court meant by "narrowest grounds," we took *Davis* en banc to clarify the approach courts should take in applying *Marks* to fractured Supreme Court decisions. *See Davis*, 825 F.3d at 1021–22. We adopted a "reasoning-based approach to applying *Marks*." *Id.* at 1021. As we explained,

> [W]hen applying *Marks* to a fractured Supreme Court decision, we look to those opinions that concurred in the judgment and determine whether one of those opinions sets forth a rationale that is the logical subset of other, broader opinions. When, however, no "common denominator of the Court's reasoning" exists, we are bound only by the "specific result."

*Id.* at 1028. In *Davis*, we also assumed, without deciding, that dissenting opinions may be considered as part of a *Marks* analysis. *Id.* at 1025; *see also id.* at 1025 n.12.

As explained above, in *City of Healdsburg*—relying on *Gerke* and taking into account the *Rapanos* dissent—we held that Justice Kennedy's "concurrence is the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases." *City of Healdsburg*, 496 F.3d at

999. As *Davis* had not yet clarified the issue, we did not engage in a reasoning-based *Marks* analysis to reach this conclusion. Instead, we relied on and accepted the Seventh Circuit's explanation in *Gerke* as to why Justice Kennedy's concurrence provided the controlling rule. *See id.* at 999–1000. Although the Seventh Circuit did not engage in an explicit reasoning-based analysis, the underlying rationale in *Gerke* is not inconsistent with that analysis.

To assess Robertson's claim that the district court applied the wrong standard to determine whether there was insufficient evidence to conclude that Robertson discharged pollutants into United States waters without a permit, we must first decide whether the en banc decision in *Davis* rendered inapplicable our prior conclusion in *City of Healdsburg* that Justice Kennedy's concurrence in *Rapanos* would control our decision about what are waters of the United States.

Our court in *Miller v. Gammie*, established the general rule that a three-judge panel is not allowed to disregard a prior circuit precedent, but rather must follow it unless or until change comes from a higher authority. 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Higher authority includes decisions by en banc panels of our court. *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1205 n.8 (9th Cir. 2005).

This raises the issue whether the precedent of *City of Healdsburg* should have been disregarded by the court below in light of the later en banc decision in *Davis*. *Miller v. Gammie* sets the rule that the district court below had to follow *City of Healdsburg* unless it was "clearly irreconcilable" with *Davis*. *Miller v. Gammie*, 335 F.3d at 893. So the controlling issue on whether *City of Healdsburg* correctly stated the standard for what are waters of the

United States, relying on Justice Kennedy's concurrence in *Rapanos*, is whether *City of Healdsburg* is clearly irreconcilable with *Davis*. If so, we should disregard it. But if not, *City of Healdsburg* remains controlling. It is to that question that we now turn.

Some elaboration on the standard developed in *Miller v. Gammie* is helpful here. In that case we considered when "a three-judge panel is free to reexamine the holding of a prior panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue." 335 F.3d at 899. The issue before us was whether, in light of intervening Supreme Court authority outlining a functional test for evaluating when immunity applied, a three-judge panel should have disregarded prior Ninth Circuit authority granting absolute immunity to social workers. *Id.* at 900. Our en banc panel in *Miller v. Gammie* held that in cases of "clear irreconcilability, a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Id.*

The "clearly irreconcilable" requirement is "a high standard." *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (internal quotation marks omitted). So long as the court "can apply our prior circuit precedent without running afoul of the intervening authority" it must do so. *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (internal quotation marks omitted). "It is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent." *Id.* (internal quotation marks and citations omitted).

*City of Healdsburg* is not clearly irreconcilable with *Davis*. *Davis* holds that an opinion that concurs in the judgment that is "the logical subset of other, broader opinions" is the "narrowest grounds" and controlling under *Marks*. *See Davis*, 825 F.3d at 1024, 1028. Contrary to Robertson's argument, *Davis* did not forbid consideration of dissents while engaging in the *Marks* analysis. *See Davis*, 825 F.3d at 1025. Consequently, so long as the opinion that is a "logical subset" is an opinion that concurred in the judgment, the "broader opinion" of which it is a subset can be a dissent.

The overarching issue in *Rapanos* was whether the breadth of the Corps' regulations was permissible. The narrowest holding was the one that restrained the Corps' authority the least. *See Rapanos*, 547 U.S. at 810 n.14 (Stevens, J., dissenting) ("I assume that Justice Kennedy's approach will be controlling in most cases because it treats more of the Nation's waters as within the Corps' jurisdiction . . ."); *Robison*, 505 F.3d at 1221 ("The issue becomes whether the definition of 'navigable waters' in the plurality or concurring opinions in *Rapanos* was less far-reaching (i.e., less-restrictive of CWA jurisdiction)."); *Gerke*, 464 F.3d at 724–25 (concluding Justice Kennedy's "test is narrower (so far as reining in federal authority is concerned) than the plurality's in most cases"). The opinion restricting federal agency discretion the least was Justice Stevens's dissent, which would have provided for the broadest federal jurisdiction of all, and which stated explicitly that it would be satisfied and uphold the Corps' jurisdiction whenever either the plurality's or Justice Kennedy's test was met. *See Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting).

But under the standard announced in *Marks*, when we interpret *Rapanos* we are to find our standard in the

narrowest opinion joining in the judgment. So the dissent that did not support the judgment is out for this purpose. We have a contest then between the plurality opinion of Justice Scalia and the concurring opinion of Justice Kennedy, both of which supported the majority judgment. Both the plurality and Justice Kennedy's opinions can be viewed as subsets of Justice Stevens's dissent because both narrow the scope of federal jurisdiction. Justice Kennedy's concurrence, however, is narrower than the plurality opinion because it restricts federal authority less. *See Rapanos*, 547 U.S. at 810 n.14 (Stevens, J., dissenting).

Although it does not go through this subset analysis explicitly, *Gerke* does recognize that Justice Kennedy's concurrence fits within the dissent, and that it narrows federal authority less than the plurality's decision. *See Gerke*, 464 F.3d at 724–25 (explaining that "[t]he four dissenting Justices took a much broader view of federal authority" than either Justice Kennedy or the plurality, and that Justice Kennedy's grounds were narrower because the plurality criticized Justice Kennedy's expansive reading, and Justice Kennedy rejected the two limitations the plurality would have imposed on federal authority). Its reasoning—how it gets to the "narrowest" opinion—is not completely undercut by *Davis*. *See Rodriguez*, 728 F.3d at 980. *Gerke*—and *City of Healdsburg*, which adopted and relied upon *Gerke*'s reasoning—are not "clearly irreconcilable" with *Davis*. *City of Healdsburg* remains valid and binding precedent. Here, jurisdiction was determined to exist under the "significant nexus" test set forth in Justice Kennedy's concurrence in *Rapanos*. We hold that there was no error in this.

**IV**

Robertson next argues that the statutory term "waters of the United States" is "too vague to be enforced in the due process sense," because Robertson could not have had "fair warning" of the meaning of that term. He asserts that he did not have fair warning because, in light of *Davis*, *City of Healdsburg* is no longer good law.

Robertson had fair warning that his conduct was criminal. The Government violates the Fifth Amendment's guarantee of due process if it "take[s] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). The underlying "principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997).

The "touchstone" of whether a statute is unconstitutionally vague, on the one hand, or the defendant instead had fair notice, on the other hand, "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267. So long as prior to the defendant's offense there were decisions which gave "reasonable warning that the law [will] be applied in a certain way," the defendant had fair warning that his conduct was criminal. *See Gollehon v. Mahoney*, 626 F.3d 1019, 1024 (9th Cir. 2010).

Robertson does not challenge the general validity of the criminal provisions of the CWA. His argument relies primarily on the effect of *Davis* on *City of Healdsburg*. As

explained above, *Davis* does not undermine the continuing validity of *City of Healdsburg* for purposes of jurisdiction. As for the notice issue, the conduct at issue in this case took place between October 2013 and October 2014, well after this court had issued *City of Healdsburg* and had held that Justice Kennedy's test controlled CWA jurisdiction, and well before this court's decision in *Davis*. *See Davis*, 825 F.3d 1014 (published June 13, 2016); *City of Healdsburg*, 496 F.3d at 995 (case published in 2007). Robertson was on notice from *City of Healdsburg* at the time of his excavation activities that wetlands and non-navigable tributaries are subject to CWA jurisdiction "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780. The jury was instructed in these terms, and convicted Robertson, holding that the elements of his crime where shown beyond a reasonable doubt. *Davis*—which was not decided until 2016, long after Robertson's conduct forming the basis for his convictions—does not affect whether Robertson had fair notice at the time of his excavation activities.[2]

## V

Robertson next argues that the district court should have granted his Federal Rule of Criminal Procedure 29(c) motion to acquit after the jury deadlocked at his first trial. This circuit has not explicitly addressed whether a defendant has

---

[2] Also, Robertson was warned by an EPA agent that he likely needed a permit to authorize his excavations. According to the agent, Robertson was warned that "if he did not have a permit, then he very likely needed a permit."

a viable sufficiency of the evidence challenge to his first trial, when his second trial ended in conviction.

If Robertson had prevailed on his sufficiency challenge at the first trial, any subsequent attempt to try him would have been barred on double jeopardy grounds. But such a claim is foreclosed because the Supreme Court in *Richardson v. United States* held that even where the Government has presented inadequate evidence at the first trial and the jury deadlocks, if the trial judge rejects the defendants' insufficiency arguments, double jeopardy protections do not bar a second trial. 468 U.S. 317, 326 (1984) ("Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial.").

Several other circuits have held that by necessary extension *Richardson* also forecloses any challenge to the sufficiency of evidence at a prior trial after a conviction at a later trial. *See United States v. Achobe*, 560 F.3d 259, 265–68 (5th Cir. 2008); *United States v. Julien*, 318 F.3d 316, 321 (1st Cir. 2003); *United States v. Willis*, 102 F.3d 1078, 1081 (10th Cir. 1996); *United States v. Coleman*, 862 F.2d 455, 460 (3d Cir. 1988).[3] We believe that these decisions are correct, and we now join them.

---

[3] In *United States v. Recio*, we held that *Richardson* did not bar us from considering whether defendants "may be prosecuted at a *third* trial if the Government presented insufficient evidence at the first." 371 F.3d 1093, 1104 (9th Cir. 2004). We explained that "[t]he procedural posture of this case allows us to consider this question because the third trial has not yet begun." *Id.* at 1104–05. We specifically declined to address the question of whether defendants "could also use their first-trial insufficiency argument to challenge their second trial on double jeopardy grounds." *Id.* at 1105 n.9.

*Richardson* makes clear that the Double Jeopardy Clause is not implicated simply because the Government presented insufficient evidence at a previous trial, and absent double jeopardy protections, a finding that insufficient evidence was offered at the first trial would have no impact on the validity of the second trial. We hold that a criminal defendant cannot challenge the sufficiency of the evidence presented at a previous trial following a conviction at a subsequent trial.

## VI

Robertson argues that there are three reasons why the district court erred in allowing Todd Tillinger, the Montana State Program Manager for the Corps and Supervisory Civil Engineer, to testify as an expert witness. First, Robertson asserts that because the law on what constitutes a "water of the United States" subject to CWA jurisdiction is unclear, "the subject matter of [Tillinger's] testimony was not suitable for expert witness consideration." Second, Tillinger's testimony was based on "guidance documents," which do not have the force of law. Finally, Robertson argues that the district court should have rejected Tillinger as an expert witness "because his jurisdictional determination relied heavily on what is termed an ordinary high water mark," which Justice Kennedy rejected as the determinative measure of whether a water is subject to the CWA.

Robertson's arguments are not persuasive. First, it is the district court—not an expert witness—that instructs the jury on what the law is. *See U.S. v. Weitzsenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993). Here, the court gave the jury clear instructions on both the elements of a CWA violation, and

the meaning of the term "waters of the United States." [4]  As discussed above, the law itself is not unclear.[5]

Robertson's second argument is both belied by the record and beside the point.  The expert disclosure statement that Robertson relies upon for his argument states that Tillinger "has substantial training and experience in the identification and classification of streams and wetlands to determine if they are considered 'waters of the United States' subject to federal regulation under the Clean Water Act ('CWA'); implementing regulations; standards set forth in the United States Supreme Court's opinion in *Rapanos v. United States*, 547 U.S. 715 (2006); and the following EPA/Army Corps of Engineers post-*Rapanos* guidance

---

[4] Jury Instruction 14 provided: "In order for you to find the defendant guilty of the crimes contained in Counts I or III, the government must prove each of the following elements beyond a reasonable doubt . . . 3.  That the discharge was to a 'water of the United States.'"  Jury Instruction 22 provided: "The term 'waters of the United States' includes traditional navigable waters and tributaries and/or adjacent wetlands that have a significant nexus to traditional navigable waters.  A tributary or adjacent wetland has a significant nexus to traditional navigable waters if it (either alone or in combination with similarly situated water bodies in the region) significantly affects the chemical, physical, or biological integrity of traditional navigable waters."  These instructions follow the standard set out in Justice Kennedy's concurrence, and that we adopted as controlling in *City of Healdsburg*.  *See Rapanos*, 547 U.S. at 780; *City of Healdsburg*, 496 F.3d at 999–1000.

[5] Robertson does not assert that Tillinger improperly testified on the ultimate issue of law.  His argument appears to be that the law is unclear, and it was improper for any expert to testify about "waters of the United States."

documents . . . ."    Tillinger based his evaluation on regulations, *Rapanos*, and guidance documents.

It does not matter which sources of authority (binding regulations or enforcement guidelines that lack the force of law) Tillinger used in evaluating waters and wetlands because it is the jury, using the instructions provided by the judge, that ultimately determines whether the creek and wetland at issue were "waters of the United States." *See United States v. Phillips*, 367 F.3d 846, 855 n.25 (9th Cir. 2004) (explaining that "whether the water is navigable [*i.e.*, is subject to CWA jurisdiction] is part of one element of a CWA violation," which the Government can be required to prove at trial)**.**

Robertson's third argument is also unpersuasive.  At the first trial, Tillinger testified that in determining whether the channel had a continuous or relatively permanent flow he looked for a high water mark.**[6]**  Although Justice Kennedy stated in *Rapanos* that the presence of an ordinary high water mark on a tributary could not be "the determinative measure" of whether a wetland adjacent to that tributary is covered by the CWA, he did not forbid the consideration of an ordinary high water mark. *See Rapanos*, 547 U.S. at 781. That Tillinger discussed using a high water mark in his evaluation of whether the channel next to the wetland was a tributary does not render his testimony improper. Regardless, it was the jury (not Tillinger) that—using the court's instructions that did not mention the ordinary high

---

**[6]** Robertson does not provide a citation for his assertion that Tillinger's jurisdictional determination relied on the ordinary high water mark.  The Government cites to Tillinger's testimony from the first trial. The parties do not direct us to any specific testimony from the second trial where Tillinger allegedly relies on the ordinary high water mark.

water mark—made the final determination that the creek and wetlands at issue were "waters of the United States." We reject Robertson's challenges to Tillinger's testimony because there was no abuse of discretion in allowing it.

## VII

Robertson next argues that the district court erred in excluding two documents: the U.S. Army Corps of Engineers Jurisdictional Determination Form Instruction Guidebook and the Crystal Mine Study. He asserts that the district court should have admitted the Manual because it would have permitted Robertson to show that the Corps "was making its jurisdictional determination on a factor expressly forbidden by Justice Kennedy under his substantial nexus test." He argues that the district court should have admitted the Crystal Mine Study because it showed "that the water quality of the Cataract drainage is very poor due to the extensive mining activity," and the Study "could have supported his argument of insubstantial connection between the wetlands and the Jefferson river."

The district court did not abuse its discretion in excluding either the Guidance Manual or the Crystal Mine Study. The district court is given "wide latitude" to determine "the admissibility of evidence because [the trial judge] is in the best position to assess the impact and effect of evidence based upon what [the judge] perceives from the live proceedings of a trial." *Layton*, 767 F.2d at 554 (quoting *United States v. Ford*, 632 F.2d 1354, 1377 (9th Cir. 1980)).

The district court explained that the Guidebook is used by the Corps "in its performance of jurisdictional determinations and, as such, discusses the applicable regulations and the law." The court excluded the Guidebook under Federal Rule of Evidence 403, concluding that "the

danger of confusing the issues and misleading the jury substantially outweighed the potential probative value of admitting the entire Guidebook." As the district court properly explained, the court provides the law to the jury. *See, e.g.*, *Weitzsenhoff*, 35 F.3d at 1287. The Guidance Manual explains how and when the Corps will assert CWA jurisdiction over wetlands and non-navigable tributaries. It was within the district court's discretion to conclude that the Guidance Manual could confuse the jury because the standards and considerations outlined in the Manual were not the same as the jury instructions, i.e., the law that the jury had to follow.[7] The district court did not abuse its discretion in excluding the Guidance Manual.

The district court likewise did not abuse its discretion in excluding the Crystal Mine Study. The district court concluded that the Study was not relevant and that "the potential prejudice from its introduction strongly outweighs any probative value." It excluded the Study under Federal Rules of Evidence 401 and 403. The district court acted well within its discretion. Whether a wetland or non-navigable water has a significant nexus to a traditionally navigable water has nothing to do with whether the traditionally navigable water is healthy. Robertson does not support his novel argument that a "significant nexus" exists only when a wetland would be polluting an otherwise clean water, with any authority. Also, this argument undermines the very purpose of the CWA, "to *restore* and maintain the chemical,

---

[7] As explained above, Robertson's arguments regarding references to the Ordinary High Water Mark and how the Corps' determines CWA jurisdiction are unpersuasive. The district court provided jury instructions, and the jury (following those instructions) made the determination that the discharge was into "waters of the United States." How the Corps makes CWA jurisdictional determinations is not controlling for the purposes of this criminal appeal.

physical, and biological integrity of the Nation's waters."
*See* 33 U.S.C. § 1251(a) (emphasis added).  In light of this
purpose, it would not make sense to conclude that the CWA
protects only clean waters from pollution from their non-
navigable tributaries, because that would disregard the
CWA's restoration purpose.  The district court did not abuse
its discretion by excluding the Crystal Mine Study, which
addressed the existing contamination in the watershed.[8]  We
reject Robertson's challenges to the district court's rulings
on the rules of evidence.  There was no abuse of discretion.[9]

**AFFIRMED.**

---

[8] Robertson properly states that the standard of review for decisions
on the admissibility of evidence is abuse of discretion.  However, he also
seems to suggest that the court should review the decisions to determine
whether exclusion of the evidence resulted in constitutional error.
Robertson does not present any substantial argument as to how exclusion
of either the Guidance Manual or the Crystal Mine Study resulted in
constitutional error.  Nor could he do so.  As explained above, exclusion
of both pieces of evidence was proper.  Not only that, but the district
court allowed Robertson to question witnesses using the Guidance
Manual and allowed Robertson to have the witness read relevant portions
of the Manual into the record.

[9] Robertson argues that if we reverse on Counts I and III, those
counts will no longer be "offenses of conviction," and "the district
court's restitution order should be vacated and the issue should be
remanded for reconsideration."  Robertson does not otherwise challenge
the district court's restitution order.  Because we affirm the convictions,
we also affirm the restitution award.