For the foregoing reasons, the decision below is AFFIRMED.

**Howard MORSEBURG,**
**Plaintiff-Appellant,**

v.

**Andre BALYON and California Arts Council, an agency of the State of California, Defendants-Appellees,**

v.

**Richard MAYER and Peter Alexander, Defendants in Intervention-Appellees.**

No. 78–2129.

United States Court of Appeals,
Ninth Circuit.

June 17, 1980.

Richard K. Simon, Los Angeles, Cal., argued, for plaintiff-appellant.

Gary Greenfield, Los Angeles, Cal., for amicus.

Henry G. Ullerich, Deputy Atty. Gen., Los Angeles, Cal., argued, for defendants-appellees.

John J. Davis, Jr., San Francisco, Cal., for amicus.

Before: SNEED, SCHROEDER and ALARCON, Circuit Judges.

SNEED, Circuit Judge:

Appellant is an art dealer. On March 24, 1977, he sold two paintings under such circumstances as to require him to pay royalties under the California Resale Royalties Act (California Act), which is set forth in full in the margin.[1] He thereupon brought

1. Cal.Civil Code provides:

§ 986. Work of fine art; sale; payment of percentage to artist or deposit for Arts Council; failure to pay, action for damages; exemptions

(a) Whenever a work of fine art is sold and the seller resides in California or the sale takes place in California, the seller or his agent shall pay to the artist of such work of fine art or to such artist's agent 5 percent of the amount of such sale. The right of the artist to receive an amount equal to 5 percent of the amount of such sale is not transferable and may be waived only by a contract in writing providing for an amount in excess of 5 percent of the amount of such sale.

(1) When a work of art is sold at an auction or by a gallery, dealer, broker, museum, or other person acting as the agent for the seller the agent shall withhold 5 percent of the amount of the sale, locate the artist and pay the artist.

(2) If the seller or agent is unable to locate and pay the artist within 90 days an amount equal to 5 percent of the amount of the sale shall be transferred to the Arts Council.

(3) If a seller or his agent fails to pay an artist the amount equal to 5 percent of the sale of a work of fine art by the artist or fails to transfer such amount to the Arts Council, the artist may bring an action for damages within three years after the date of sale or one year after the discovery of the sale, whichever is longer.

(4) Moneys received by the council pursuant to this section shall be deposited in an account in the Special Deposit Fund in the State Treasury.

(5) The Arts Council shall attempt to locate any artist for whom money is received pursuant to this section. If the council is unable to locate the artist and the artist does not file a written claim for the money received by the council within seven years of the date of sale of the work of fine art, the right of the artist terminates and such money shall be transferred to the operating fund of the council as reimbursement to fund programs of the council.

(6) Any amounts of money held by any seller or agent for the payment of artists pursuant to this section shall be exempt from attachment or execution of judgment by the creditors of such seller or agent.

(b) Subdivision (a) shall not apply to any of the following:

(1) To the initial sale of a work of fine art where legal title to such work at the time of such initial sale is vested in the artist thereof.

(2) To the resale of a work of fine art for a gross sales price of less than one thousand dollars ($1,000).

(3) To a resale after the death of such artist.

(4) To the resale of the work of fine art for a gross sales price less than the purchase price paid by the seller.

(5) To a transfer of a work of fine art which is exchanged for one or more works of fine art or for a combination of cash, other property, and one or more works of fine art where the fair market value of the property exchanged is less than one thousand dollars ($1,000).

(c) For purposes of this section, the following terms have the following meanings:

(1) "Artist" means the person who creates a work of fine art.

(2) "Fine art" means an original painting, sculpture, or drawing.

(d) This section shall become operative on January 1, 1977, and shall apply to works of fine art created before and after its operative date.

(e) If any provision of this section or the application thereof to any person or circum-

suit challenging the Act's constitutionality, claiming that it is preempted by the 1909 Copyright Act[2] and that it violates due process and the Contracts Clause of the Constitution. The lower court rejected these contentions. We affirm.

## I.

### PREEMPTION UNDER THE 1909 COPYRIGHT ACT

Appellant's preemption argument has compelled us to review in some detail the preemption doctrine as applied by the Supreme Court and developments in copyright law during much of this century and, to some extent, even those of an earlier time. We shall not extend this opinion describing in detail our research but shall limit it to stating our reasoning in a direct and straightforward manner.

Before commencing this statement we emphasize that this case concerns the preemptive effect of the 1909 Act only. We do not consider the extent to which the 1976 Act, particularly section 301(a) and (b), 17 U.S.C. § 301(a) and (b), may have preempted the California Act. It is unavoidable that certain of our reasons will be weighed and measured to determine their applicability to the 1976 Act. Nonetheless, our holding, as well as our reasons, to repeat, are addressed to the 1909 Act only.

Appellant utilizes as the foundation to his argument portions of sections 1 and 27 of the 1909 Act. The selected portion of section 1 reads:

> "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right: (1) To print, reprint, publish, copy, *and vend* the copyrighted work." (Italics supplied.)

The section 27 portion, after providing that the copyright was distinct from the object and that the latter's transfer did not of itself transfer the copyright, reads:

> "but nothing in this title shall be deemed to forbid, prevent, or *restrict the transfer* of any copy of a copyrighted work the possession of which has been lawfully obtained." (Italics supplied.)

On this foundation appellant asserts that the California Act impairs the artist's ability *to vend* his "work of fine art" when it is a "copyrighted work" within the meaning of section 1 of the 1909 Act. He also asserts that the California Act "restricts the transfer" of a copyrighted "work of fine art" when in the hands of one who lawfully obtained it, such as a purchaser from the artist. It follows, appellant contends, that the California Act conflicts with the 1909 Act. Under these circumstances, appellant concludes, the California Act is preempted by the 1909 Copyright Act.

To evaluate appellant's position we shall describe briefly certain aspects of the "works of fine art" market place as well as our perception of the current attitude of the Supreme Court with respect to preemption generally.

## A.

### *Aspects of the Market Place For "Works of Fine Art"*

Turning to the market place for "works of fine art," it is frequently the case that such works are not copyrighted and that the sales proceeds realized by the artist upon its first sale are significantly less than the prices at which it subsequently changes hands. *See* Sheehan, *Why Don't Fine Artists Use Statutory Copyright?—An Empirical and Legal Survey*, 22 Bull. Copyright Soc'y 242 (1975); Price & Price, *Right of Artists: The Case of the Droit de Suite, in* Art Works: Law, Policy, Practice 67 (1974). There are several explanations for both circumstances. The failure to utilize copyright protection has its source in, among other things, ignorance, a distaste for legal details, weak bargaining power, and the

stance is held invalid for any reason, such invalidity shall not affect any other provisions or applications of this section which can be affected, without the invalid provision or application, and to this end the provisions of this section are severable.

**2.** The 1976 Copyright Act became effective after the sales in question.

desire to avoid defacing the work with a copyright symbol. *See* Note, *Courting the Artist With Copyright: The 1976 Copyrights Act*, 24 Wayne L.Rev. 1685–86 (1978). An increase in the price of an artist's works after they have left his hands may be the result of greater recognition of the artist, an increase in the overall demand for art works, inflation, unpredictable shifts in fashion and taste, or some combination of the above.

The California Act functions under these conditions. It is an American version of what the French call the *droit de suite*, an art proceeds right. *See* Emley, *The Resale Royalties Act: Paintings, Preemption and Profit*, 8 Golden Gate Univ.L.Rev. 239, 240 n.9 (1978). It provides by force of state law a conditional economic interest of a limited duration in the proceeds of sales other than the initial one. Similar rights perhaps could be obtained by contract. *See* Projansky & Siegelaub, *The Artist's Reserved Rights Transfer and Sale Agreement*, Art Works: Law, Policy, Practice, *supra* at 81. Opinions differ as to whether the existence of such an interest, without regard to its source, will increase the incentives to produce available to the young and not well known artist. *See* Katz, *Copyright Preemption Under the Copyright Act of 1976: The Case of Droit de Suite*, 47 Geo.Wash.L. Rev. 200, 220–21 (1978). Some argue that only a few artists will benefit, as appears to have been the French experience, while others believe such an interest prevents exploitation of the artist's creativity. *See* Hauser, *The French Droit de Suite: The Problem of Protection For the Underprivileged Artist Under the Copyright Law*, 6 Bull. Copyright Soc'y 94 (1959). *See* Merryman & Elsen, Law, Ethics and the Visual Arts, ch. IV *passim* (1979). Resolution of that dispute is not necessary for the purposes of this opinion.

### B.

*Preemption and the Supreme Court*

■ With respect to preemption the Supreme Court's emphasis varies from time to time. At times the preemption doctrine has been applied with nationalistic fervor while during other periods with generous tolerance of state involvement in areas already to some extent the subject of national concern. *See* Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court*, 75 Colum.L.Rev. 623 *passim* (1975). Without regard to the emphasis of the period certain basic doctrinal notions repeatedly are used in applying preemption. Thus, the extent to which the federal law has "occupied the field" and the presence of "conflict" between the federal and state law have always been focuses of analytic attention. The nature of the Court's emphasis at a particular time is revealed by whether "occupation of the field" and "conflict" are easily found to exist or not. "Occupation" can require no more than the existence of a federal law generally applicable to a significant portion of the area in question to no less than an express statement demonstrating an intention to occupy the area duly enacted by Congress. "Conflict," likewise, can require no more than a mechanical demonstration of potential conflict between federal and state law to no less than a showing of substantial frustration of an important purpose of the federal law by the challenged state law. When the emphasis is to protect and strengthen national power "occupation" and "conflict" are easily found while not so easily found when the emphasis is to promote federalism.

■ Although there is a discernable cyclical character in the Supreme Court's choice of emphasis, it is also true that, without regard to the particular point in the cycle at which a preemption issue arises, the choice of emphasis is heavily influenced by the area of the law in which the issue arises. Thus, when the area concerns foreign affairs, as in *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), or labor relations, as in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the emphasis, not surprisingly, is on the national interest, while when the area is protection of consumers of commodities, as in *Florida Lime*

*& Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the emphasis understandably is upon the state's interest particularly and the imperatives of federalism generally. *See* Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court, supra* at 638–39.

Fortunately, the Supreme Court provided clear guidance with respect to the emphasis proper for this case. This was done in *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), in which the Court held valid a California statute making it a criminal offense to "pirate" recordings produced by others, an activity against which the copyright holder at that time had no protection. The interests of California in particular and of federalism in general were given emphasis. The Court refused to read the Copyright Clause of the Constitution to foreclose the existence of all state power "to grant to authors the exclusive Right to their respective Writings." *Id.* at 560, 93 S.Ct. at 2311. Also it held that the 1909 Copyright Act did not preempt the California statute. In support of this conclusion the Court observed that Congress had not exercised its full power under the Copyright Clause and that it was not required to do so. In addition, Congress had evidenced no intent, either expressly or impliedly, to bar the states from exercising their power. As a consequence, the area was not fully occupied by the federal government. This was supported additionally by the Court's explicit conclusion that no conflict between the national and state law existed because state law regulated a matter not covered by the federal Copyright Act of 1909 in a manner that did not disturb a careful balance struck by Congress between those matters deserving of protection and those things that should remain free. *Id.* at 567–70, 93 S.Ct. at 2315–2316. Both *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), cases in which state unfair competition laws were held to be preempted by the federal patent law, were distinguished on the ground that in each case the state law upset the federally struck balance between protection and freedom. Finally, the Court in *Goldstein* held that California's statute did not restrain the use or expression of knowledge, truths ascertained, conceptions, or ideas.

■ We hold that *Goldstein* governs this case. The Copyright Clause does not prevent the enactment by California of the Resale Royalties Act. Nor has the Copyright Act of 1909 explicitly forbidden the enactment of such an act by a state. A bar by implication cannot be found in the word "vend" in section 1 of the 1909 Act. Doubt concerning the correctness of this conclusion disappears when the rights of the artist who creates a work of fine art are analyzed. Prior to the initial sale he holds title to the work and, assuming proper steps have been taken, all rights given to him by reason of his copyright. None of these provide the right afforded to him by the California Resale Royalties Act. This is an additional right similar to the additional protection afforded by California's anti-pirating statute upheld in *Goldstein*. It is true that under the California Act the right it bestows cannot be waived or transferred. This limits the right created by state law but not any right created by the copyright law.

■ It would be proper to brand this conclusion as sophistry were it true that the right "to vend" provided by section 1 of the 1909 Act meant a right to transfer the works at all times and at all places free and clear of all claims of others. It is manifest that such is not its meaning. It merely means that the artist has "the exclusive right to transfer the title for a consideration to others." *See Bauer v. O'Donnell*, 229 U.S. 1, 11, 33 S.Ct. 616, 617, 57 L.Ed. 1041 (1912). The California Act does not impair this right; it merely creates a right in personam against a seller of a "work of fine art."

■ Nor can we conclude that section 27 of the 1909 Act by implication precludes the enactment of resale royalty acts by the states. Technically speaking such acts in no way restrict the transfer of art works. No

lien to secure the royalty is attached to the work itself, nor is the buyer made secondarily liable for the royalty. The work can be transferred without restriction. The fact that a resale may create a liability to the creator artist or a state instrumentality and, at the same time, constitute an exercise of a right guaranteed by the Copyright Act does not make the former a legal restraint on the latter. It is true, of course, that the imposition of the royalty may well influence the duration of a purchaser's holding period of a work of fine art. To cover the royalty the holder may defer selling until the work's value has appreciated to a greater extent than otherwise might have been the case. The aggregate volume of business done by the relevant art markets may be diminished somewhat. Moreover, the possibility of the imposition by the state of very high royalty rates and more than one state "taxing" a single sale[3] suggests that resale royalty acts under certain circumstances could make transfer of the work of fine art a practical impossibility. Without regard to how the preemption argument should fare under those circumstances, we are not confronted with them here. We explicitly restrict our holding to the facts before us.

■ These observations permit us to conclude that the 1909 Copyright Act has not occupied the area with which we are concerned and that the California Act is not in conflict with it. A resale royalty is not provided by the 1909 Act; no hostility toward such a royalty is expressed by the Act; and, on the facts before us, the obligation to pay a resale royalty does not impermissibly restrict resales by the owners of works of fine art. The teaching of *Goldstein* is not limited to situations in which the matter regulated by state law is not covered by the 1909 Act. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879,

40 L.Ed.2d 315 (1974), makes this clear. The crucial inquiry is not whether state law reaches matters also subject to federal regulation, but whether the two laws function harmoniously rather than discordantly. We find no discord in this instance. For these reasons we distinguish *Sears* and *Compco* in the same manner as was done in *Goldstein.*

## II.

## THE CONTRACTS CLAUSE AND DUE PROCESS ISSUE

Appellant also contends that even if the Resale Royalties Act is not preempted by federal copyright law, it violates either the Contracts Clause or the due process provisions of the Constitution. We hold otherwise.

### A.

### *The Contracts Clause Issue*

■ The California Act with respect to initial sales by the artist subsequent to its enactment impairs only the power of the artist and his purchaser to contract. The exercise of the police power of states frequently has this effect and raises no Contracts Clause issue. *See Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905). With respect to initial sales prior to enactment of the California Act a Contracts Clause issue lurks sufficiently close by to require discussion.

The economic interest bestowed on an artist, who previous to the Act's enactment has parted with his work, can be viewed as a benefit conferred upon him by the state because of its desire to promote artistic endeavor generally. So viewed no Contract Clause issue emerges. Appellant, however, contends that the California Act rewrites his contract with the person from whom he acquired the work to require payment to the creator of the work or the California

---

3. The California Act imposes its obligation when "a work of fine art is sold and the seller resides in California or the sale takes place in California." Cal.Civil Code § 986(a). A similar statute enacted by another state could lead to a particular sale being construed as having been made in each state. Similar multiple application could occur if the statute of a state other than California imposed its obligation to pro-

tect resident artists whose works were sold within that state. A seller, who was a resident of California and who sold the work within the second state, would be confronted with the application of statutes of two states. Even if the second state adopted a statute identical to that of California, a sale by a California resident in the second state would result in multiple application.

Arts Council. This is not a compelling characterization of the operation of the Act. However, without regard to whether the California Act can be said to rewrite all pre-California Act sales contracts, the inescapable effect of the Act is to burden such a buyer of a work of fine art with an unbargained-for obligation to pay a royalty to the creator of that work or the Arts Council upon resale. The buyer's obligation is increased, and such an alteration no doubt requires that the Act be scrutinized under the Contracts Clause. *See, e. g., Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, n.16, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727.

 This scrutiny reveals no unconstitutional impairment. The Contracts Clause is not absolute. "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). Nor are all impairments of contracts improper. "The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977). The degree to which a state may impair the obligations of contract varies with the public need for that impairment. *Allied Structural Steel v. Spannaus, supra,* 438 U.S. at 241–42, 98 S.Ct. at 2721. An insignificant impairment does not need the extensive justification that otherwise might be necessary. *Id.* at 245, 98 S.Ct. at 2723. Moreover, we should defer to the state legislature's determination of the public need whenever possible. *United States Trust Co. v. New Jersey, supra,* 431 U.S. at 22–23, 97 S.Ct. at 1517–1518. However, an impairment that is severe, permanent, irrevocable and retroactive and which serves no broad, generalized economic or social purpose violates the Contracts Clause. *See Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. at 250, 98 S.Ct. at 2725, 57 L.Ed.2d 727.

If impairment there be, which we are not prepared to concede, it is not of that magnitude. The obligation of the appellant created by the California Act serves a public purpose and is not severe. Under these circumstances the California Act survives a Contracts Clause challenge.

### B.

### *The Due Process Issue*

Appellant's due process arguments fare no better. He asserts that he has lost a fundamental property right; that the Resale Royalties Act affects the very heart of the relationship between buyers and sellers of art; and that there is no public interest whatsoever to support such meddling. We reject these contentions.

We view the California Act, whatever its merits as a legislative matter, as economic regulation to promote artistic endeavors generally. "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The courts are not to act as "superlegislature[s] to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . ." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

 We would ignore a national characteristic were we to say that an act modeled upon a French law lacked a rational basis. Nor need we do so. The required rational basis exists. Moreover, the California Act is neither arbitrary nor capricious. In its present form it does not affect fundamental rights.

Appellant emphasizes that the California Act is retroactive, removing it from the sphere of the usual economic regulation. This is arguable because it is only applicable to sales made subsequent to the passage of the California Act. In any event, "legisla-

tion readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co., supra,* 428 U.S. at 16, 96 S.Ct. at 2893, 49 L.Ed.2d 752. Many laws upset some expectations regarding the legal consequences of prior conduct. Much legal business consists of assisting clients to adjust their affairs to the new laws. It has been said that "[o]nly when such retroactive effects are so wholly unexpected and disruptive that harsh and oppressive consequences follow is the constitutional limitation exceeded." *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger,* 543 F.2d 703, 708 (9th Cir. 1976); *accord, In re U.S. Financial, Inc.,* 594 F.2d 1275 (9th Cir. 1979). The consequences of the California Act in its present form are not of that magnitude.

Affirmed.