**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHUCK CLOSE; LADDIE JOHN DILL,
individually and on behalf of all
others similarly situated,
*Plaintiffs-Appellants*,

v.

SOTHEBY'S, INC., a New York
corporation,
*Defendant-Appellee.*

No. 16-56234

D.C. No.
2:11-cv-08604-
MWF-FFM

THE SAM FRANCIS FOUNDATION;
CHUCK CLOSE, individually and on
behalf of all others similarly
situated; LADDIE JOHN DILL,
individually and on behalf of all
others similarly situated,
*Plaintiffs-Appellants*,

v.

CHRISTIE'S, INC., a New York
corporation,
*Defendant-Appellee.*

No. 16-56235

D.C. No.
2:11-cv-08605-
MWF-FFM

THE SAM FRANCIS FOUNDATION;
CHUCK CLOSE, individually and on
behalf of all others similarly
situated; LADDIE JOHN DILL,
individually and on behalf of all
others similarly situated,
                *Plaintiffs-Appellants*,

                    v.

EBAY INC., a Delaware corporation,
                    *Defendant-Appellee.*

No. 16-56252

D.C. No.
2:11-cv-08622-
MWF-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted April 10, 2018
Pasadena, California

Filed July 6, 2018

Before:  Danny J. Boggs,* Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Bybee

---

* The Honorable Danny J. Boggs, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Copyright

The panel affirmed in part and reversed in part the district court's dismissal of claims for resale royalties under the California Resale Royalties Act, which grants artists an unwaivable right to 5% of the proceeds on any resale of their artwork under specified circumstances.

Affirming the dismissal in part, the panel held that plaintiffs' CRRA claims concerning sales that postdated the 1976 Copyright Act's effective date of January 1, 1978, and thus were covered by the 1976 Act, were expressly preempted by 17 U.S.C. § 301(a).

Reversing in part, the panel held that CRRA claims concerning sales that occurred between the CRRA's effective date of January 1, 1977, and the 1976 Act's effective date of January 1, 1978, were not expressly preempted, nor were they preempted by conflict preemption. The panel remanded those claims to the district court for further proceedings.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Michael A. Bowse (argued), Ira Bibbero, and Eric M. George, Browne George Ross LLP, Los Angeles, California, for Plaintiffs-Appellants.

Angela Dunning (argued) and John C. Dwyer, Cooley LLP, Palo Alto, California, for Defendant-Appellee eBay Inc.

Deanne E. Maynard (argued), Morrison & Foerster LLP, Washington, D.C.; Paul T. Friedman, Morrison & Foerster LLP, San Francisco, California; Howard B. Comet and Steven A. Reiss, Weil Gotshal & Manges LLP, New York, New York; for Defendant-Appellee Sotheby's Inc.

Adam K. Lloyd, Matthew E. Delgado, Hillary A. Hamilton, and Jason D. Russell, Meagher & Flom LLP, Los Angeles, California, for Defendant-Appellee Christie's Inc.

Steven A. Hirsch, Keker Van Nest & Peters LLP, San Francisco California; John J. Davis Jr., McCracken Stemerman, San Francisco, California; for Amici Curiae California Lawyers for the Arts and Peter Alexander.

**OPINION**

BYBEE, Circuit Judge:

The California Resale Royalties Act ("CRRA") grants artists an unwaivable right to 5% of the proceeds on any resale of their artwork under specified circumstances. To that end, the CRRA requires the seller of the artwork or the seller's agent to withhold 5% of the resale price and pay it to the artist or, if the artist cannot be found, to the California Arts Council. If the seller or the seller's agent fails to pay the 5% resale royalty, the artist may bring an action for damages.

Plaintiffs are artists and their successors in interest seeking resale royalties under the CRRA from the statute's effective date of January 1, 1977, to the present. The issue in this case is whether plaintiffs' claims are preempted by federal copyright law. The district court held that they are, as a matter of both express and conflict preemption.

We affirm in part and reverse in part. Plaintiffs' CRRA claims covered by the 1976 Copyright Act—i.e., those concerning sales postdating the 1976 Act's effective date of January 1, 1978—are expressly preempted by 17 U.S.C. § 301(a). We therefore affirm dismissal of those claims.

The 1909 Copyright Act, however, has no express preemption provision. As such, plaintiffs' CRRA claims covered only by the 1909 Act—i.e., those concerning sales that occurred between the CRRA's effective date of January 1, 1977, and the 1976 Act's effective date of January 1, 1978—cannot be expressly preempted. Nor are they preempted by conflict preemption. *See Morseburg v. Balyon*, 621 F.2d 972, 977–78 (9th Cir. 1980). Accordingly, we

reverse dismissal of those claims and remand them to the district court for further proceedings.

## I.  LEGAL AND FACTUAL BACKGROUND

### A.  *The Droit de Suite*

Many nations recognize the *droit de suite*,[1] under which artists receive a royalty each time the original, tangible embodiment of their work is resold.  The practice was first recognized in France in 1920 and then adopted in other civil-law jurisdictions.  More recently, a number of common-law jurisdictions have adopted some form of the *droit de suite*.  In those countries that recognize it, the *droit de suite* is considered a moral right, albeit one with economic value.  *See generally* U.S. Copyright Office, Droit de Suite: *The Artist's Resale Royalty* (Dec. 1992) ("1992 Copyright Report"); U.S. Copyright Office, *Resale Royalties: An Updated Analysis* (Dec. 2013) ("2013 Copyright Report"); 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §§ 8C.04[A][1] & n.3 (rev. ed. 2017) ("NIMMER").[2]

The *droit de suite* protects visual artists, who face particular difficulty in capitalizing on their work.  Literary

---

[1] Literally, the "right of following on."

[2] There is a surprising number of articles on the *droit de suite*.  *See, e.g.*, Monroe E. Price, *Government Policy and Economic Security for Artists: The Case of the Droit De Suite*, 77 YALE L.J. 1333 (1968); Alexander Bussey, Note, *The Incompatibility of Droit De Suite with Common Law Theories of Copyright*, 23 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1063 (2013); Jay B. Johnson, Comment, *Copyright: Droit De Suite: An Artist Is Entitled to Royalties Even After He's Sold His Soul to the Devil*, 45 OKLA. L. REV. 493 (1992).

and recording artists can generally profit from their efforts by controlling the reproduction of books or music. For visual artists such as painters and sculptors, however, the right to control reproduction is often not their principal source of income. Rather, it is often the sale of their original work that allows them to make a profit. The *droit de suite* gives these artists an economic interest in subsequent sales of their original work, thereby allowing them to capture some of its appreciation in value after the first sale.

The *droit de suite* also appears in international copyright law. Since 1948, the Berne Convention has recognized that artists possess an "inalienable right to an interest in any sale of the work subsequent to the first transfer by the author of the work." Berne Convention for the Protection of Literary and Artistic Works art. 14*ter*(1), Sept. 9, 1886, as amended Sept. 28, 1979, S. Treaty Doc. No. 99-27 (1986). Nevertheless, the Berne Convention does not obligate its signatories to adopt the *droit de suite*. Instead, the Berne Convention makes the recognition of such rights optional, but rewards such recognition with reciprocity: countries recognizing the right will protect the right of each others' artists. *See* Lee D. Neumann, *The Berne Convention and Droit De Suite Legislation in the United States: Domestic and International Consequences of Federal Incorporation of State Law for Treaty Implementation*, 16 COLUM.-VLA J.L. & ARTS 157, 159 (1992).

The United States became a signatory to the Berne Convention in 1989, but to date, it has not adopted the *droit de suite*. As early as the 1970s, Congress considered adopting the *droit de suite* as part of U.S. copyright law, but those efforts have never proved successful. A *droit de suite* provision made its way into an early version of the Visual

Artists Rights Act of 1990 ("VARA"), but was removed from the bill that Congress ultimately enacted. *Compare* S. 1619, 100th Cong., 1st Sess. (1987), *with* VARA, Pub. L. No. 101-650, §§ 601–10, 104 Stat. 5089 (1990). Instead, VARA directed the Copyright Office to conduct a study on the feasibility of implementing such a right in the United States. VARA § 608(b).

In 1992, the Copyright Office issued an extensive report concluding that there was insufficient economic or copyright-policy justification to adopt the *droit de suite* in the United States. *See generally* 1992 Copyright Report. The report recommended that "[g]iven potential problems of preemption, enforcement, and multiple application, any *droit de suite* that is enacted in the United States should be at the federal level." *Id.* at vi; *see also id.* at 77–86. Two decades later, members of Congress requested that the Copyright Office revisit the issue, and the Copyright Office issued a second report. *See generally* 2013 Copyright Report. This time, in light of "the adoption of resale royalty laws by more than thirty additional countries since the Office's prior report," the Copyright Office endorsed "implementation of a resale royalty right in the United States . . . as one alternative to address the disparity in treatment of artists under the copyright law." *Id.* at 1, 3. Congress has not acted on the Copyright Office's recommendation.

B.  *The California Resale Royalties Act of 1976 ("CRRA")*

The CRRA is "the first, and thus far only, American recognition of the *droit de suite*." NIMMER § 8C.04[B].

Under the CRRA, the seller of "a work of fine art"[3] or the seller's agent must withhold 5% of the sale price and pay it to the artist. Cal. Civ. Code § 986(a). If the seller or agent is unable to locate and pay the artist within 90 days, the 5% royalty goes to the California Arts Council. *Id.* § 986(a)(2). In that event, the California Arts Council must attempt to locate and pay the artist. *Id.* § 986(a)(5). If the artist has not been located after seven years, the Council may then use the funds to acquire fine art for public buildings. *Id.* If the seller or agent fails to pay the 5% royalty, the artist may bring an action for damages and attorneys' fees. *Id.* § 986(a)(3). Notably, the artist's right to the 5% royalty may not be waived or reduced by contract. *Id.* § 986(a).

As originally enacted, the CRRA applied to sales of fine art in California *or* by a California seller (whether inside California or not). *Id.* But, as discussed in greater detail below, we have since limited the statute to regulate only sales in California. *Sam Francis Found. v. Christie's, Inc.*, 784 F.3d 1320, 1322 (9th Cir. 2015) (en banc). Other conditions to the CRRA's application include, inter alia, that the artist must be a citizen of the United States or resident of California; the sale must occur after the initial sale by the artist (i.e., it must be a resale); the sale must be for $1,000 or more; the sale cannot be for less than the purchase price paid by the seller; and the sale must occur during the artist's life or within 20 years of his death. Cal. Civ. Code § 986(a)–(c).[4]

---

[3] "Fine art" is defined as "an original painting, sculpture, or drawing, or an original work of art in glass." Cal. Civ. Code § 986(c)(2).

[4] Secondary sources suggest that, though enacted over forty years ago, the CRRA has been seldom enforced. *See* NIMMER § 8C.04[C][2] ("[T]he annotated California Code reveals only a trickle of cases under this

In 1977, art dealer Howard Morseburg sold two paintings under circumstances requiring him to pay royalties under the CRRA. *Morseburg*, 621 F.2d at 974–75. He then brought suit to challenge the California law on multiple grounds, including that it conflicted with the 1909 Copyright Act. *Id.* To resolve this conflict preemption question, we relied on the Supreme Court's decision in *Goldstein v. California*, 412 U.S. 546 (1973). *Id.* at 977. *Goldstein* held that a California statute making it a criminal offense to sell pirated musical recordings was not preempted by the 1909 Act; because the California statute regulated a matter not covered by the 1909 Act and did so "in a manner that did not disturb a careful balance struck by Congress between those matters deserving of protection and those things that should remain free," there was no conflict between state and federal law. *Id.* (citing *Goldstein*, 412 U.S. at 567–70).

Applying *Goldstein*, we concluded that the CRRA created "an additional right similar to the additional protection afforded by California's anti-pirating statute" and therefore did not conflict with the 1909 Act. *Id.* at 977–78 ("The crucial inquiry is . . . whether the two laws [i.e., state and federal] function harmoniously rather than discordantly. We find no discord in this instance."). We expressly declined, however, to consider whether the CRRA was preempted by the 1976 Act. *Id.* at 975.

---

section."); John E. McInerney III, *California Resale Royalties Act: Private Sector Enforcement*, 19 U.S.F. L. REV. 1, 3 (1984) ("[T]he Act is perhaps the State's most neglected and underused law."); Patricia Cohen, *Artists File Lawsuits, Seeking Royalties*, N.Y. TIMES, Nov. 1, 2011, at C1 (reporting that, since the CRRA's enactment, about 400 artists had received a total of $328,000).

C. *First Proceedings before the District Court and First Appeal*

In 2011, plaintiffs filed putative class-action complaints against Sotheby's, Christie's, and eBay, alleging claims under the CRRA and derivative claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* The statute of limitations for claims under the CRRA is three years after the date of the relevant sale or one year after discovery of that sale, whichever is longer. Cal. Civ. Code § 986(a)(3). Plaintiffs accordingly sought to represent two classes: (1) a class of artists or their estates purportedly owed CRRA royalties on sales that took place within three years of when the actions were filed; and (2) a class of artists or their estates purportedly owed CRRA royalties on sales that were never disclosed to the artists and that took place more than three years before the actions were filed—all the way back to the CRRA's effective date of January 1, 1977.

The district court dismissed plaintiffs' complaints with prejudice, holding that the CRRA's regulation of sales outside California violated the dormant Commerce Clause and that the offending portion of the statute was not severable. *Estate of Graham v. Sotheby's Inc.*, 860 F. Supp. 2d 1117, 1125–26 (C.D. Cal. 2012). On appeal, a majority of this court voted to initially hear the case en banc. *Sam Francis*, 784 F.3d at 1323. Sitting en banc, we agreed with the district court that the CRRA's regulation of out-of-state sales violated the dormant Commerce Clause but held that the offending provision was severable from the remainder of the statute, such that plaintiffs still had potentially viable claims respecting in-state sales. *Id.* at 1322. We remanded to the three-judge panel to consider defendants' alternative arguments, including preemption. *Id.* The panel, in turn,

remanded to the district court for it to consider defendants' alternative arguments in the first instance. *See Sam Francis Found. v. Christie's, Inc.*, Nos. 12-56067, 12-56068, 12-56077, 2015 WL 4429309, at \*1 (9th Cir. July 16, 2015).

D. *Second Proceedings before the District Court*

On remand, defendants again moved to dismiss, arguing that (1) the CRRA is preempted; (2) the CRRA effects an unconstitutional taking; and (3) eBay is not a seller or a seller's agent subject to the CRRA. In 2016, the district court granted defendants' motions and dismissed the actions with prejudice, holding that the CRRA was preempted by federal copyright law, as a matter of both conflict and express preemption. *Estate of Graham v. Sotheby's, Inc.*, 178 F. Supp. 3d 974, 979–80 (C.D. Cal. 2016).

With respect to conflict preemption, the district court reasoned that the first sale doctrine, codified in the 1909 Copyright Act and reaffirmed in the 1976 Copyright Act, "provides that 'once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution.'" *Id.* at 982 (quoting *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998)). The court concluded that the CRRA restricted transactions that the first sale doctrine intended to leave unrestricted and therefore conflicted with federal law. *Id.* at 983–84. While acknowledging our 1980 decision in *Morseburg*, the court held that "recent decisions of the Supreme Court and the Ninth Circuit have so eroded *Morseburg* that it [ ] no longer represents a binding interpretation of the first sale doctrine and the CRRA." *Id.* at 985.

In the alternative, the district court addressed express preemption, holding that the CRRA "does no more than broaden the distribution rights granted under the Copyright Act" and is thus expressly preempted by the 1976 Act, 17 U.S.C. § 301(a). *Id.* at 989. The court noted it would reach this same result "whether or not *Morseburg* is still binding precedent" because *Morseburg* did not address the 1976 Act. *Id.* at 991. Although the court's preemption holdings completely disposed of all three actions, the court proceeded to consider defendants' alternative arguments. *Id.* at 991. The court rejected defendants' Takings Clause argument but accepted eBay's argument that it was neither a seller nor a seller's agent and therefore was not subject to liability under the CRRA. *Id.* at 980. Plaintiffs appealed the district court's judgment in each action, and we consolidated the appeals.[5]

## II. ANALYSIS

"It is well-established that Congress has the power to preempt state law." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007) (citing U.S. CONST. art. VI, cl. 2). In general, there are three forms of preemption: express preemption, conflict preemption, and field preemption. *Arizona v. United States*, 567 U.S. 387, 398–400 (2012); *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 948 (9th Cir. 2014). Because Congress has not preempted the field in copyright law, *see Foad*

---

[5] We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review *de novo* a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1153 (9th Cir. 2017). "We similarly review *de novo* questions of preemption under the Supremacy Clause." *Id.*

*Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821,
827 (9th Cir. 2001), only two forms of preemption are at
issue here: express and conflict. Below, we first hold that
plaintiffs' claims arising under the 1976 Act are expressly
preempted by 17 U.S.C. § 301(a). We then consider whether
what remains of plaintiffs' claims conflicts with the 1909
Act. We conclude that *Morseburg* controls our conflict
preemption analysis and that plaintiffs' claims arising under
the 1909 Act are therefore not preempted. Finally, we
consider defendants' alternative argument based on the
Takings Clause.[6]

A. *Express Preemption*

The 1976 Copyright Act adopted, for the first time, an
express preemption provision in § 301(a) and thereby
accomplished a sea change in the relative powers of the states
vis-à-vis the federal government over copyright protection.
The House of Representatives anticipated that the preemption
provision "would accomplish a fundamental and significant
change in the present law." H.R. REP. No. 94-1476, at 129
(1976). "By substituting a single Federal system for the
present anachronistic, uncertain, impractical, and highly
complicated dual system, the bill would greatly improve the
operation of the copyright law and would be much more
effective in carrying out the basic constitutional aims of
uniformity and the promotion of writing and scholarship." *Id.*
Section 301(a) states:

---

[6] We need not address eBay's argument that it is not subject to the
CRRA because our express preemption holding disposes of all claims
against eBay. In this regard, we take judicial notice of the fact that eBay
did not exist and cannot be held liable for any sales of fine art that
occurred before January 1, 1978.

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). In accordance with § 301(a), we have adopted a two-pronged test to determine whether a state law claim is preempted by the 1976 Act. *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017). "First, we decide whether the subject matter of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103." *Id.* (quotation marks omitted). "Second, assuming it does, we determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders." *Id.* (quotation marks omitted).

With respect to the first prong, the subject matter of copyright encompasses "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). This includes, for example, "pictorial, graphic, and sculptural works." *Id.*

§ 102(a)(5).  There is no doubt that plaintiffs' claims under the CRRA for resale royalties on works of "fine art"—defined as original paintings, sculptures, drawings, or works in glass, Cal. Civ. Code § 986(c)(2)—fall within the subject matter of copyright.  Plaintiffs do not dispute this prong of the test.

The second prong is also satisfied—that is, plaintiffs' state law claims assert rights "equivalent to rights within the general scope of copyright as specified by section 106 of the Copyright Act." *Maloney*, 853 F.3d at 1019.  To explain why this is so, we begin with a short history of the first sale doctrine.  The Copyright Act of 1891 provided that the copyright owner had "the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending" the copyrighted work.  Copyright Act of 1891, § 4952, 26 Stat. 1106, 1107 (1891).  In *Bobbs-Merrill Co. v. Straus*, the Supreme Court construed the right to "vend" as being limited to the first sale.  210 U.S. 339 (1908).  Bobbs-Merrill Company owned the copyright to the novel *The Castaway*, each copy of which stated that its retail price was $1 and that a retail sale at any lesser price would be treated as copyright infringement.  *Id.* at 341.  R. H. Macy & Company purchased copies of the book from wholesalers and retailed them for less than $1, and Bobbs-Merrill sued for infringement.  *Id.*  The Court held that Bobbs-Merrill could not control Macy & Company's resale of the purchased copies: a copyright owner "who has sold a copyrighted article, without restriction, has parted with all right to control the sale of it." *Id.* at 350.

Congress codified the first sale doctrine in the 1909 Copyright Act[7] and later retained it in the 1976 Act. *See Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1077 (9th Cir. 2015). Today, § 109(a) provides that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a). "The practical effect of this language is to significantly circumscribe a copyright owner's exclusive distribution right 'only to the first sale of the copyrighted work' because 'once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution.'" *Adobe*, 809 F.3d at 1076–77 (quoting *Quality King*, 523 U.S. at 141). One purpose of the first sale doctrine is to effect the "common law's refusal to permit restraints on the alienation of chattels." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013). Another purpose is to "free[ ] courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods" and "avoid[ ] the selective enforcement inherent in any such effort." *Id.* at 539.

In this case, plaintiffs' CRRA claims assert rights equivalent to the federal distribution right codified in § 106(3), as limited by the first sale doctrine codified in § 109(a). Section 106(3) grants copyright holders the exclusive right "to distribute copies or phonorecords of the

---

[7] Copyright Act of 1909, Pub. L. No. 60-349, § 41, 35 Stat. 1075, 1084 (1909) ("[N]othing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.").

copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," while the first sale doctrine circumscribes that right by limiting it to the first sale of a copyrighted work.

Although the CRRA's resale royalty right and § 106(3)'s distribution right are not coextensive, they are equivalent. The two rights differ in that one grants artists the right to receive a percentage payment on all sales of artwork after the first, while the other grants artists the right to receive full payment on the first (and only the first) sale. But, at root, both concern the distribution of copies of artwork and define artists' right (or lack thereof) to payment on downstream sales of those copies. *See* NIMMER § 8C.04[C][1] ("[I]t is the same conduct in relation to the same subject matter that triggers either rights or immunities under both federal and state law. It would seem to follow necessarily that the [CRRA] is [expressly] preempted."); David E. Shipley, *Droit de Suite, Copyright's First Sale Doctrine and Preemption of State Law*, 39 HASTINGS COMM. & ENT. L. J. 1, 25 (2017) ("The conduct that triggers the claim under the CRRA is the distribution of the work. And thus, it is equivalent to a claim for violation of the distribution right and is [expressly] preempted.").

The equivalence of the two rights is further underscored by the manner in which the CRRA both expands and restricts the federal distribution right. The CRRA *expands* the federal distribution right because, whereas the first sale doctrine limits artists' right to payment to the first sale, the CRRA grants artists an unwaivable right to a 5% royalty on all downstream sales. *See* Cal. Civ. Code § 986(a). Indeed, the CRRA is designed precisely to alter the first sale doctrine by affording artists a right to at least some measure of payment

on every sale after the first. At the same time, the CRRA also *restricts* the federal distribution right by forbidding artists from fully alienating copies of their artwork. In effect, the CRRA creates an inalienable restraint on alienation.

In short, the CRRA does not merely grant an additional right beyond what federal copyright law already provides but fundamentally reshapes the contours of federal copyright law's existing distribution right. This runs counter to § 301(a), which precludes "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright," even if they are not precisely within the contemplation of the Copyright Act.

Plaintiffs raise a number of arguments in response. First, they argue that the CRRA cannot be expressly preempted because it creates a monetary, not a distribution, right. According to plaintiffs, the CRRA governs proceeds on the sale of art, not the distribution of art itself; a seller need only pay the artist a royalty, not obtain the artist's permission to make a sale. But plaintiffs' attempted distinction between monetary and distribution rights takes an unduly narrow view of § 106(3). That provision represents not merely copyright holders' ability to choose when to sell a copy of their work and to whom. It also represents copyright holders' ability to receive payment for selling copies of their work. Even though there are differences in how the CRRA and § 106(3) affect artists' right to payment—one requires a royalty on all sales after the first, and the other contemplates full alienation upon the first sale—there is significant overlap between the two for the reasons explained above.

Second, plaintiffs argue that the CRRA's resale royalty right cannot be expressly preempted because artists can create

a similar right by contract. Plaintiffs have misunderstood the difference between a law that permits an act and a law that compels an act. Federal copyright law protects the first sale only and permits (by not forbidding) purely private arrangements between an artist and a first purchaser with respect to subsequent sales. The CRRA, however, is a restraint on contract because the artist and the purchaser cannot contract around the *droit de suite*. The artist cannot agree to waive the 5% royalty; the only variance the CRRA permits is for the artist and buyer to agree that the buyer (as a future seller) will pay the artist *more* than the 5% royalty. Cal. Civ. Code § 986(a) ("The right of the artist to receive an amount equal to 5 percent of the amount of such sale may be waived only by a contract in writing providing for an amount in excess of 5 percent of the amount of such sale."). The availability of a right to future payments through a private contract has no bearing on whether the legislative prescription of such a right is preempted by federal law.

Third, plaintiffs argue that *Morseburg* should control our express preemption analysis. Acknowledging that *Morseburg* did not address the preemptive effect of the 1976 Act, plaintiffs argue that *Morseburg*'s reasoning is nevertheless dispositive of the present case. But "we emphasize[d] that this case concern[ed] the preemptive effect of the 1909 Act only." *Morseburg*, 621 F.2d at 975. We noted that the 1976 Act became effective after the sales at issue in Morseburg's suit. *Id.* at 975 n.2. Then, in case anyone missed our point, we recited that "our holding, as well as our reasons, to repeat, are addressed to the 1909 Act only." *Id.* at 975. Furthermore, our reasoning in *Morseburg* derived from the Supreme Court's decision in *Goldstein*, and that case was grounded in a different era of federal copyright law, before the Copyright Act even had an express preemption provision. *Morseburg*

did not pretend to speak to the preemptive effect of the 1976 Act and does not control our express preemption analysis here.

Finally, plaintiffs point to the legislative history of VARA. In enacting VARA in 1990, the House of Representatives indicated that: "State artists' rights laws that grant rights not equivalent to those accorded under the proposed law are not preempted, even when they relate to works covered by H.R. 2690. For example, the law will not preempt a cause of action for a misattribution of a reproduction of a work of visual art or for a violation of a right to a resale royalty." H.R. REP. No. 101-514, 1990 U.S.C.C.A.N. 6915, 6931 (1990). This brief statement postdates the 1976 Copyright Act by over a decade, and at best, represents the House's understanding—right or wrong—of how existing law might intersect with the changes proposed in VARA. It is not legislative history of the preemption clause adopted in the 1976 Act. Nor are we aware of any similar statement in the actual legislative history of the 1976 Act. VARA's legislative history does not alter our analysis regarding the equivalence of the state and federal rights at issue. *See, e.g.*, *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history . . . is not a legitimate tool of statutory interpretation;" rejecting the use of subsequent legislative history as a test for interpreting a preemption clause).

In short, the CRRA falls within the subject matter of the Copyright Act and asserts rights equivalent to those found in § 106(3) of the Copyright Act. The CRRA is therefore expressly preempted by § 301(a). Plaintiffs' CRRA claims arising after the effective date of the 1976 Act—January 1, 1978—are barred.

B.  *Conflict Preemption*

Unlike the 1976 Act, the 1909 Act contained no express preemption provision.  Our holding on express preemption therefore does not account for plaintiffs' claims, if any actually exist, that arose between the CRRA's effective date of January 1, 1977, and the 1976 Act's effective date of January 1, 1978.    This remaining sliver of claims is preempted only if it conflicts with the 1909 Act.    Our decision in *Morseburg*, which likewise addressed sales of fine art occurring in 1977, is squarely on point.  Its holding that the CRRA does *not* conflict with the 1909 Act therefore controls our analysis of plaintiffs' remaining claims. *Morseburg*, 621 F.2d at 977–78.

Recognizing this, and following the district court, defendants argue that *Morseburg* has been implicitly overruled.  Because neither the Supreme Court nor our court sitting en banc has ever expressly overruled *Morseburg*, we must look to the "clearly irreconcilable" test of *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc).  In *Miller*, we set out the standards under which one panel of this court may hold that a prior decision of the court has been "effectively overruled."  *Id.* at 900.  A prior decision is effectively overruled if intervening higher authority has so "undercut the theory or reasoning underlying the prior circuit precedent" as to make the precedent "clearly irreconcilable" with the intervening authority.  *Id.*  "The clearly irreconcilable requirement is a high standard."  *United States v. Robertson*, 875 F.3d 1281, 1291 (9th Cir. 2017) (quotation marks omitted).  Accordingly, "[i]t is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent."  *Id.*  "So long as

the court can apply our prior circuit precedent without running afoul of the intervening authority it must do so." *Id.* (quotation marks omitted).

Defendants' argument that *Morseburg* has been implicitly overruled has two parts: first, they argue that *Morseburg*'s reasoning is inconsistent with the Supreme Court's reasoning in *Quality King*, 523 U.S. 135, and *Kirtsaeng*, 568 U.S. 519; and second, they argue that *Morseburg* is no longer viable after our prior en banc decision in this case, *Sam Francis*, 784 F.3d 1320.  In *Quality King*, the Supreme Court rejected a "cramped reading" of the first sale doctrine and instead endorsed its "broad reach":  "The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."  523 U.S. at 152 (holding the first sale doctrine applies to copies of a copyrighted work manufactured in the United States, sold abroad, and imported back into the United States).  Similarly, in *Kirtsaeng*, the Court characterized the idea that the first sale doctrine might permit a copyright owner to "exercise downstream control" as "an absurd result."   568 U.S. at 544 (holding the first sale doctrine applies to copies of a copyrighted work manufactured abroad).  The Court further stated that, "even though § 106(3) forbids distribution of a copy of [a copyrighted work] without the copyright owner's permission," "once [the] copy . . . has been lawfully sold (or its ownership otherwise lawfully transferred), the buyer of that *copy* and subsequent owners are free to dispose of it as they wish."  *Id.* at 524.

Our prior en banc decision in this case held that the CRRA's "regulation of the conduct of the seller and the seller's agent is neither 'minor' nor a 'regulation of the

proceeds' alone." *Sam Francis*, 784 F.3d at 1324 n.1. Defendants contrast this with *Morseburg*'s statement that the CRRA "in no way restrict[s] the transfer of art works." 621 F.2d at 977. They claim that the combination of the Supreme Court's broad description of the first sale doctrine and our court's broad interpretation of the CRRA so undermine the foundations of *Morseburg* that the decision is no longer good law.

To be sure, defendants have identified some "tension between the intervening higher authority and prior circuit precedent." *Robertson*, 875 F.3d at 1291. But we are not persuaded that defendants have identified "clear irreconcilability." The Supreme Court's intervening decisions in *Quality King* and *Kirtsaeng* have not altered the first sale doctrine in any way relevant to this case. These decisions reinforce the first sale doctrine and contain language that might persuade us to decide *Morseburg* differently if presented to us today. But the fact that we might decide a case differently than a prior panel is not sufficient grounds for deeming the case overruled. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1189 (9th Cir. 2011); *United States v. Alferahin*, 433 F.3d 1148, 1156 n.3 (9th Cir. 2006). Nothing short of "clear irreconcilability" will do.

The *Morseburg* panel, of course, was well aware of the first sale doctrine. 621 F.2d at 975 (quoting § 27 of the 1909 Act). *Morseburg* recognized that the royalty imposed by the CRRA "may well influence the duration of a purchaser's holding period of a work of fine art," but concluded that the "liability" represented by the royalty was not "a legal restraint" on the seller's right to "transfer[ ] [the work] without restriction." *Id.* at 978. The core of the first sale

doctrine—that copyright holders exhaust their distribution right over copies of their work upon the first sale—is the same today as it was over a century ago when the Supreme Court decided *Bobbs-Merrill*. The fact that the Supreme Court has since described the doctrine in different words and applied it in different circumstances does not make the first sale doctrine clearly irreconcilable with *Morseburg*.

Defendants' arguments concerning *Sam Francis* have greater force, but we find no sure basis to declare *Morseburg* overruled. Our reading of the CRRA in the prior en banc decision at most contradicts isolated statements in *Morseburg*; it does not completely undermine *Morseburg*'s reasoning or mandate a different result in that case. *Compare Sam Francis*, 784 F.3d at 1324 n.1 ("The [CRRA's] regulation of the conduct of the seller and the seller's agent is neither 'minor' nor a 'regulation of the proceeds' alone."), *with Morseburg*, 621 F.2d at 977–78 ("Technically speaking such acts in no way restrict the transfer of art works. No lien to secure the royalty is attached to the work itself, nor is the buyer made secondarily liable for the royalty. The work can be transferred without restriction."). Speaking of the 1909 Act and the CRRA, *Morseburg* said that "[t]he crucial inquiry is not whether state law reaches matters also subject to federal regulation, but whether the two laws function harmoniously rather than discordantly." 621 F.2d at 978. *Morseburg* upheld the CRRA because it represented an "additional right" not addressed in the 1909 Act, thus comporting with the then-existing balance between state and federal copyright protection. As we have discussed, the 1976 Act drastically altered that balance. But the shift in the legal landscape following the 1976 Act has no bearing on plaintiffs' claims arising before the 1976 Act's effective date.

In sum, *Morseburg*'s reasoning would be suspect today, but it is not clearly irreconcilable with intervening higher authority. It therefore controls our analysis of plaintiffs' claims arising under the 1909 Act. We conclude that plaintiffs' claims concerning sales occurring between the CRRA's effective date of January 1, 1977, and the 1976 Act's effective date of January 1, 1978 are not preempted. On remand, the district court should determine if any of plaintiffs' claims arise between January 1, 1977, and December 31, 1977.

## C.  *Defendants' Takings Clause Argument*

Defendants alternatively argue that the CRRA effects an unconstitutional taking in violation of the Fifth Amendment, as applied to the states via the Due Process Clause of the Fourteenth Amendment. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1198 (9th Cir. 1998). According to defendants, the Copyright Act grants artists a property right in their works but only until they sell the works; after that, the artists have no further property interest. The CRRA upsets this arrangement by taking 5% of the proceeds on resales of fine art and giving those proceeds to artists. Plaintiffs respond that the CRRA, like the Copyright Act itself, merely defines the respective rights of artists, buyers, and sellers, thus creating property rights.

Initially, it would seem that defendants' argument is unavailing. To begin with, it parallels the substantive due process argument that we rejected in *Morseburg*. In *Morseburg*, the plaintiff art dealer argued that the CRRA violated the Due Process Clause because he had "lost a fundamental property right." 621 F.2d at 979. We rejected the argument, holding that the CRRA was "neither arbitrary

nor capricious" and did "not affect fundamental rights." *Id.* Where a statute passes muster under the Due Process Clause, "it would be surprising indeed to discover" that the same statute violated the Takings Clause. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986). Nevertheless, in the instant case, defendants essentially repackage the Due Process Clause argument from *Morseburg* into a Takings Clause argument.[8]

In some respects at least, the *droit de suite* resembles legislation imposing rent control, setting a minimum wage, or requiring a zoning permit. All of these measures impose real economic costs on people or businesses and may result in a wealth transfer to someone else, but they are not, for that reason alone, a governmental taking. *See id.* at 223 ("In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist. Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is

---

[8] Defendants have argued the Takings Clause as though it were a substantive constraint on laws the California legislature can enact. This misunderstands the Takings Clause. That clause requires the government to pay just compensation when it takes property for public use; it does not disable the government in the same sense as the Constitution's prohibitions on "pass[ing]" a bill of attainder or ex post facto law, U.S. Const. art. I, § 9, cl. 3, or "mak[ing]" a law infringing First Amendment rights, *id.* amend. I. Were we to hold that the CRRA effected a taking for public use, California would be liable for just compensation. The state would have the choice of keeping the law and paying compensation, or avoiding payment by foregoing the law. A taking by itself does not void the law.

violated whenever legislation requires one person to use his or her assets for the benefit of another.").

Nevertheless, we will not decide the Takings Clause argument here. Although the CRRA applies only to sales of fine art that occurred after its effective date, those sales might involve fine art the seller acquired *before* the CRRA's enactment. *See* Cal. Civ. Code § 986(d) ("This section shall become operative on January 1, 1977, and shall apply to works of fine art created before and after its operative date."). The application of the CRRA to sales of fine art acquired *before* the CRRA's enactment suggests greater interference with "investment-backed expectations," *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)), and may raise a concern under the Takings Clause. The district court's discussion of defendants' Takings Clause argument did not account for such sales. *See Estate of Graham*, 178 F. Supp. 3d at 994 ("[I]t is not clear at this early stage of litigation whether any such resales are at issue in this action. If it turns out in discovery that Defendants did resell Plaintiffs' art that was originally acquired before 1976, the Court will entertain arguments as to whether the Takings Clause precludes Plaintiffs' claims as to those resales."). If, on remand, plaintiffs' can show that they have any remaining claims, we will leave it to the district court to decide in the first instance how the Takings Clause affects those claims.

## III.  CONCLUSION

Our decision today means that the CRRA had a short effective life. California's statute permissibly coexisted for exactly one year alongside the 1909 Act. Once the 1976 Act took effect, however, the balance of state versus federal

copyright protection shifted and the CRRA was preempted by § 301(a).  Thus, plaintiffs at most can only state claims for the period between the CRRA's effective date of January 1, 1977, and the 1976 Act's effective date of January 1, 1978. We express no opinion as to the merits of plaintiffs' remaining claims, if any exist.

Appeal Nos. 16-56234 and 16-56235 against Sotheby's and Christie's are **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.  As no claims remain against eBay, Appeal No. 16-56252 against eBay is **AFFIRMED**.  The parties shall bear their own costs on appeal.